UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


ABBOTT LABORATORIES, et al.,  *    Case No. 17-CV-3095(CBA)
                        *
          Plaintiffs,  *    Brooklyn, New York
                        *    July 10, 2017
    v.                 *
                        *
H&H WHOLESALE SERVICES,  *
 INC., et al.,          *
                        *
          Defendants.  *
                        *
* * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiffs:         GEOFFREY POTTER, ESQ.
                        TIMOTHY WATERS, ESQ.
                        Patterson Belknap Webb & Tyler
                         LLP
                        1133 Avenue of the Americas
                        New York, NY 10036

For H&H Wholesale         LAURA BIRGER, ESQ.
 Services, Inc.:         ALAN LEVINE, ESQ.
                        Cooley Godward Kronish, LLP
                        1114 Avenue of the Americas.
                        New York, NY  10036


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

```
1            (Proceedings commenced at 3:51 p.m.)

2            THE CLERK:  Civil cause for status conference,

3   docket no. 17-CV-3095, Abbott Laboratories, et al. against

4   H&H Wholesale Services, Inc., et al.  Will the parties please

5   state your names for the record.

6            MR. POTTER:  Good afternoon, Your Honor.  Jeffrey

7   Geoffrey Potter and Timothy Waters for Abbott.

8            MS. BIRGER:  Good afternoon, Your Honor.  Laura

9   Berger and Alan Levine for the H&H defendants.

10            THE CLERK:  The Honorable Lois Bloom presiding.

11            THE COURT:  Good afternoon, Mr. Potter, Mr. Waters,

12   Mr. Levin and Ms. Birger.  How's everybody today?

13            MS. BIRGER:   Very good, Your Honor.

14            MR. WATERS:  Good.

15            THE COURT:  Can you believe that people would not

16   be prepared for a plea?

17            MS. BIRGER:   I was stunned.

18            MR. WATERS:  I know Mr. Greenberg.  He's a very

19   fine lawyer. I don't know why he had his real estate partner

20   here.

21            THE COURT:  You know, again, I know it's off topic,

22   but the Federal Defenders are the best attorneys that we see.

23            So to see somebody who is of modest means hire an

24   attorney and they are not even here -- she surrendered last

25   Thursday.
```

3

```
 1          So the idea that on the worst day of her life she

 2     doesn't have anybody advising her, again, I'm sure that Mr.

 3     Greenberg -- I don't know him at all.  But I'm sure that he

 4     met with her but still -- anyway.

 5          I'm sorry I digress, but that's why we're behind

 6     today.

 7          MR. WATERS:  No, we saw.  We were here.  We

 8     understand.

 9          THE COURT:  SO this is a status conference in

10     plaintiff's action against H&H and on June 16th, defendant

11     filed a motion to impose a protective order against

12     plaintiffs to exclude from the seized documents those that

13     were turned over to United Lex that don't reference Freestyle

14     marks and plaintiff has now responded.

15          Those are ECF entries 31 and 32.

16          And the plaintiffs are requesting that the motion

17     be denied without prejudice and that the parties be ordered

18     to meet and confer.

19          I held a telephone conference on June 22nd and I

20     denied defendant's motion without prejudice and I did order

21     the parties to meet and confer and, unfortunately, it appears

22     that the parties have not been able to resolve their

23     disputes, and specifically the parties have not been able to

24     agree to search terms and date restrictions.

25          And I was going to be holding this conference by
```

4

1    telephone. However, by letter dated July 7th, plaintiffs

2    asked that the conference be held in person.

3            I had my law clerk call to Ms. Berger, or Mr.

4    Levine, to ask if that would be on consent and so we

5    converted it to an in person conference, which I'm glad,

6    because I never got to meet the two of you. I've only heard

7    you as disembodied voices on the phone.

8            So I've gone over the letter requests and I

9    understand, I believe, what is at issue here.

10           And I didn't think that it was going to do a whole

11   lot to tell you to come back at a different time. I think

12   we're going to have the same dispute to resolve no matter how

13   much time goes into it.

14           So I could tell you a couple of things right off

15   the bat, Ms. Birger.

16           That when H&H argues that the 2015 case discovery

17   was restricted to documents related to the importation of

18   FreeStyle strips in 2014, while the 2017 action concerns the

19   alleged importation of domestic counterfeit strips after the

20   injunctions, I'm not really going for those limits.  Let me

21   tell you why.

22           The 2015 case wasn't actually limited to 2014. It

23   was before you took over the case and we did a sampling, a

24   random sampling, in the international case.

25           And H&H said that for that one year where we asked

5

1   for the sampling, that they had 6,000 responsive documents.

2              And so H&H, through its prior counsel, made a huge

3   fuss that it would be unduly burdensome for them to produce

4   every year that everybody else was producing.

5              And so it wasn't that the 2015 case was limited to

6   2014.  That was them begging that their client not be put

7   through the ringer and now Abbott, of course, is requesting

8   that there be a more expansive search done.

9              Let me also say that I find it somewhat unrealistic

10  of you to think that whatever they find in the one case is

11  not going to be used in the other case. I don't think there's

12  anything in the rules to support that.

13             I already gave an example at an earlier conference

14  of a case by Magistrate Judge Moses in the Southern District,

15  and I don't see that there's any support for your proposition

16  that if they find something in the other case, that they're

17  not going to be able to use it at the deposition, for

18  instance, of Mr. Goldman.

19             So those two things -- I'm just giving you my

20  inclination off the bat of that just didn't strike me as

21  you're in a strong position to make those arguments.

22             As far as agreeing to search terms and production

23  parameters -- one of the other points -- and let me just make

24  sure, you did get the letter that was filed under seal on

25  July 10th, today?

6

1          MS. BIRGER:   Yes, we did, Your Honor.

2          THE COURT:  Okay.  I'm making sure, because when I

3     see it's under seal, I get nervous that they may not have

4     seen it.

5          MR. WATERS:  We always email those out, Your Honor.

6          THE COURT:  Okay.  Very good.

7          It seems that there could be an agreement made  as

8     to terms, that they weren't going to agree to limit it just

9     to the FreeStyle marks, as you were insisting. It looks like

10    a core concern is Holland Trading.

11         And so, again, I would like to hear some argument

12    on why we couldn't come to an agreement.  They're not going

13    to let it be just FreeStyle marks. Holland Trading seems to

14    be a real concern for legitimate reasons.

15         So what can we work out here, Ms. Birger?

16         MS. BIRGER:   So there's a couple of things, Your

17    Honor.  And just so that you know, we did discuss

18    specifically this issue in an attempt to reach some

19    resolution with Abbott.

20         One thing to keep in mind is the distinction

21    between the seizure order and discovery in this case.

22    And I think that's particularly important to the last point

23    that Your Honor made about Holland Trading.

24         The fact is that the seizure order, as Judge Amon

25    limited it, is to matters that refer or relate to merchandise

7

1    bearing the FreeStyle marks.

2         So if, for example, there were conversations with

3    FreeStyle about, gee, should we start to do business with you

4    with regard to other products, or products in general, it's

5    actually not within the scope of the seizure order.  Full

6    stop.

7         Now, does that mean that it's not a concern to

8    them?  They couldn't serve a discovery request under Rule 26

9    and we could have a conversation?  No.  Of course, not.

10        But that doesn't mean that they're entitled under

11   the seizure order to just take it from our server without us

12   having the opportunity to review and have that conversation.

13        THE COURT:  Let me say I can agree with you, but

14   what would be the outcome?

15        If they were to serve the discovery request --

16        MS. BIRGER:   Your Honor, we actually told them.

17   We've given them already the Holland Trading documents that

18   we have.  That's not the issue.

19        The issue is whether Holland Trading should be the

20   subject of search terms being used for the protective order.

21        And, in fact -- I mean, not for the protective

22   order.  For the seizure order.

23        And, in fact, they're not even willing to limit it

24   to Holland Trading, because we asked them with regard to date

25   restrictions.  They said well, at least for documents that

8

1    have to do with Holland Trading we would want to go back

2    earlier.

3            And I said to them we might be able to agree on

4    longer date restrictions for Holland Trading, if, in fact,

5    there was a reasonable date restriction for other documents.

6            And they said oh, no, no.  That we don't want to

7    do, but refused to propose a date restriction at all for

8    other documents, but said for Holland Trading they want to go

9    back all the way.  And so --

10           THE COURT:  Well, again, I'm the one that asked the

11   question, so you should get back on track of what you wanted

12   to present to me.

13           MS. BIRGER:  Sure.

14           THE COURT:  I follow you that there is a

15   distinction between the seizure order and what would be

16   relevant within discovery context.

17           My question was so what difference would it make?

18   If they have to make a specific request and they know it

19   exists, other than you now winning the victory of the day,

20   what difference would it make in the long run here?

21           MS. BIRGER:  There's two differences?

22           One is going forward they're continuing to

23   implement the seizure order.  And we think the search terms

24   should be designed to get to what Judge Amon allowed under

25   the seizure order.  Documents referring to the FreeStyle

9

1      marks.

2              That is separate, frankly, from willingness to

3      produce Holland Trading documents.  So that is the first

4      thing.

5              THE COURT:  As far as implementing the seizure

6      order, the seizure order, in my mind, has already been

7      implemented.

8              MS. BIRGER:   And that's just it, Your Honor.

9      It hasn't.  They've taken the server.  They have all of our

10     documents, but they are continuing to search them, via their

11     vendor, and cull them out and take them.

12             So --

13             THE COURT:  And they've produced them to you.

14             MS. BIRGER:   Well --

15             THE COURT:  The vendor produces them --

16             MS. BIRGER:   But that's the dispute we're having,

17     right?

18             THE COURT:  Okay.

19             MS. BIRGER:   So the dispute is that if we see

20     documents on there -- the difference under the two scenarios

21     that Your Honor presented is under Rule 26, if we said yes,

22     we'll give you documents having to do with Holland Trading,

23     we would do what any party does.  We do search terms.  We

24     gather the documents.  We review for privilege.  We turn them

25     over.

1          Under the seizure order, they get to tell United

2     Lex you know what we'd like to see?  We'd like to see

3     anything that has to do with -- and this is exactly what Mr.

4     Potter tolw me he's doing. We'd like to see anything that has

5     to do with counterfeit documents.  We'd like to see anything

6     that has to do with Holland Trading.

7          And then United Lex runs some search terms.  We

8     don't know what they are.  We do get to see the documents,

9     but under the current scenario, we have the right to withhold

10    any, other than on grounds of privilege.

11         And so we're not reviewing for responsiveness.

12    We're not reviewing for responsiveness for a document request

13    that tap ins what it is we're supposed to be responding to.

14    That is a practical difference.

15         And since the seizure order is not complete, it is

16    a live thing that is happening on a daily basis, setting

17    parameters for what they're entitled to get that way matters

18    to us, Your Honor.

19         That is fundamentally the difference and that is

20    why it is so important to draw a distinction between the

21    seizure order and discovery.

22         And to some extent this is a tempest in a teapot

23    with regard to Holland Trading because the very first thing

24    they asked for was Holland Trading documents, and they got

25    them, before we first realized that they were getting stuff

1    that didn't refer to FreeStyle marks.  So --

2              THE COURT:  Well, their argument is that the

3    Holland Trading documents do relate to FreeStyle marks.  I

4    know that's going to be their argument.

5              MS. BIRGER:   It may be, Your Honor, but the fact

6    is Holland Trading sells a number of products.

7              And so their argument is not that all the Holland

8    Trading documents relate to the FreeStyle marks, but that

9    they think it's important to their claim, because they'd like

10   to establish the length of the relationship with Holland

11   Trading, the nature of the relationship with Holland Trading,

12   how it evolved, long before --

13             THE COURT:  Well, again, the argument that was put

14   in the letter that was sent to me said that there is some

15   information in the documents that there was -- prior to the

16   counterfeit there was some relationship and -- between

17   Holland Trading and H&H.

18             MS. BIRGER:   That's true.

19             THE COURT:  And so, again, they're trying to show

20   when the decision was made, and when they knew that there

21   were counterfeit goods that were being traded.

22             MS. BIRGER:   So, again, Your Honor -- and I don't

23   mean to cut you off. I apologize.

24             THE COURT:  You're not.

25             MS. BIRGER:   Again, Your Honor, then it's

1     important to look at their complaint.  And they are saying

2     they want to trace the history because it's relevant to their

3     showing of perhaps willfulness or of how the relationship

4     evolved.

5             But their actual allegations are that the

6     counterfeiting started in reaction to the injunction that was

7     entered in October of 2015 and the first documented instance

8     of any sale is at the very end of 2016.

9             And you may recall our first proposal to Your Honor

10    on the telephone was that the protective order should start

11    at January 1, 2016.

12            In an effort to meet and confer, we have moved back

13    to October 9, 2015.

14            THE COURT:  But the argument being -- and again,

15    that they could have amended the original action that they

16    had to supplement to these new allegations against H&H.

17            So they first were investigating the international

18    boxes, and then when they found out that there was, in their

19    mind, counterfeiting going on regarding domestic strips, they

20    could have amended but for -- because they were asking for a

21    seizure order, it wouldn't have been under seal, and it would

22    have exposed your client.

23            If what you're saying is they've now found other

24    things that date back further, they could certainly amend

25    their complaint, Ms. Birger, couldn't they?

1           MS. BIRGER:   Of course, they can amend their

2      complaint, and I'm not suggesting that.

3           But I don't think that's what they're saying.

4           THE COURT:  Well --

5           MS. BIRGER:   I think what they're saying is they

6      found instances of conversations with H&H and Holland Trading

7      about selling product, and that to be fair, the documents

8      they're talking about are H&H making sure that the H&H

9      products are legitimate and being -- the way they're reading

10     them, alert to the idea that there could be counterfeiting.

11          So let's put it in context.  It doesn't change the

12     allegations they're making, which is that the counterfeiting

13     starts much later.

14          THE COURT:  Mr. Waters, do you want to respond?

15          MR. WATERS:  Sure.

16          So, Your Honor, I think in terms of the differences

17     between the seizure order and discovery there's a big issue

18     there that's not being addressed, which is counterfeiters who

19     are subject to an ex parte seizure order can't be allowed to

20     say these documents over here are outside the scope of the

21     seizure order.  You can't see them.  I won't give you

22     meaningful information about them but trust me, these are

23     outside the scope.

24          And I say that, Your Honor, because we have an idea

25     what these documents are that they're withholding.  They

1    still refuse to show it to us.  They gave us a log that gives

2    us no information; less information than a privilege log.

3              United Lex, under the seizure order, they are

4    correct.  Page 6 of the seizure says United Lex gets all the

5    documents.  United Lex does the review. United Lex determines

6    what's related to referring to FreeStyle and they produce

7    those documents.

8              So what we're facing and what this dispute arose

9    from is United Lex made that determination. H&H objects to

10   it.  They're objecting to it unilaterally.  They're trying to

11   overturn it without giving any information to the court or to

12   us.

13             If United Lex went off the rails, we want to

14   address it, but we can't do it in the blind.

15             THE COURT:  So your suggestion was, as was

16   implemented in the other case, that they allow you to review

17   whatever those documents are, but that there not be any

18   waiver of any privilege or any other objection that they may

19   make, but then you wouldn't be in the dark as to what they're

20   withholding.

21             MR. WATERS:  Absolutely.

22             If you want to use the Federal Rules, as an

23   example, Rule 26, for inadvertent production.  We get the

24   documents.  They say it's outside the scope.  We sequester.

25   We don't use it, except to resolve the dispute until the

1      dispute is resolved.

2                  THE COURT:  And why would that not work here, Ms.

3      Birger?

4                  MS. BIRGER:   Because, Your Honor, the question is

5      what's in the scope and what isn't. And again, keep in mind

6      all we're asking for are search terms.

7                  Let's just go back to what Mr. Waters just said

8      about United Lex.

9                  Judge Amon did not say I am delegating the power to

10     decide what's within the scope of the seizure order of some

11     vendor.

12                 THE COURT:  I'm following you.

13                 MS. BIRGER:   Okay.

14                 THE COURT:  I understand, but look. You're coming

15     to me and asking me to make a determination, and I'm more in

16     the blind than United Lex is.

17                 MS. BIRGER:  Your Honor, again, here is the

18     proposal we made the Abbott and I will make it to you.  We

19     should be searching for all documents that talk about

20     FreeStyle or all documents that talk about Abbott and let's

21     see where that leaves us.

22                 That should get you documents referring or relating

23     to the FreeStyle marks.  It's very broad.

24                 THE COURT:  I don't think that's true.  And I'll

25     tell you why.

1          By analogy, since this is all in my mind analogous

2     to a Fourth Amendment search warrant, okay?  We frequently

3     get drug deals --

4          MS. BIRGER:   This is true.

5          THE COURT:  -- where the tapes are not talking

6     about drugs, but are talking about other things.

7          MS. BIRGER:   So, Your Honor, for this reason,

8     actually, I suggested that Abbott should propose search terms

9     that they think work, because if, in fact, you think there's

10    a code or something -- the question still remains how to make

11    this work.

12         THE COURT:  So I thought that that's what had been

13    proposed, Ms. Birger, and maybe I'm wrong. I thought that

14    there had been counterfeit or any version of counterfeit.

15         I thought that when they asked for there to be

16    something regarding Holland Trading, that's because their

17    best lead is that Holland Trading was involved in the

18    counterfeiting that they're saying H&H has perpetrated.

19         So I thought that in addition to the marks that

20    you're talking about, that those are not not suggestions that

21    in my mind go so far afield from these subject matter of what

22    Judge Amon had allowed.

23         MS. BIRGER:   That may be, Your Honor, as to the

24    word "counterfeiting."

25         As to Holland Trading, there would be the

1    intermediate step of if Holland Trading were used, or

2    Holland, or some combination of it as a search term, there

3    still needs to be then a responsiveness to termination like

4    you would do under Rule 26.  Does this actually refer to the

5    FreeStyle marks, or let me give you an example

6    hypothetically.

7             Let's say a different company's products were being

8    bought from Holland Trading, not theirs, it would hit on the

9    search terms and they should not see it.  They should not see

10   what their competitors are doing with H&H.

11            And so that's where we are asking for some sort of

12   give in play here.  There need to be search terms and there

13   need to be some sort of responsiveness review and that's why

14   Rule 26 works better than the seizure order for stuff other

15   than the FreeStyle marks because it solves that problem.

16       Otherwise you have the trouble of if you use Holland

17   Trading as a search term and you come up with documents where

18   one of their competitors is selling product through Holland

19   Trading to my client, that's going to hit on the search terms

20   and they don't want to trust us on withholding it.  I

21   understand that.  But it's also completely outside the scope

22   of the seizure order.

23            MR. LEVINE:  Okay.

24            THE COURT:  Yes, Mr. Waters.

25            MR. LEVINE:  Your Honor, United Lex says they're a

1      vendor.

2               So if you don't proceed with search terms, then

3      they -- Patterson Belknap is calling the play into its vendor

4      on a continuing basis.  We don't know what instructions are

5      being given.  There's no record of what they're asking for.

6               And it becomes an open source, if you will, of

7      document discovery that is beyond our review.  And a seizure

8      order is very limited legally.  It's limited to the language

9      of the order because it creates a seized product like in a

10     search warrant.

11              And I've had lots of search warrants, Your Honor --

12              THE COURT:  Your only problem is he wrote that

13     order that Judge Amon signed.

14              MR. LEVINE:  I know that.  Which is why --

15              THE COURT:  That's your problem.

16              MR. LEVINE:  Which is why he should be held to the

17     words that he used.

18              And there are by analogy lots of criminal cases

19     where a search warrant is executed against a company and

20     immediately after the search warrant, within a couple of

21     weeks, the government then serves grand jury supoenas to get

22     specifically documents or information that were beyond the

23     scope of the language of the search warrant.  Because the

24     search warrant is -- the government is held to the language

25     of its search warrant.

19

1          Mr. Potter, now the way he is interpreting this,

2    isn't held to the language of the seizure order.  Of, if you

3    will, he's held to the broadest possible reading of it which

4    is not reviewable.

5          THE COURT:  Well, ths is the part that you had me

6    on.  The part me on was that United Lex is their vendor.

7    That I completely understand.  That they are working with

8    their vendor to supply the documents.  That I got.

9          But let me just say to you you're moving for a

10   protective order in a -- so we're talking apples and oranges

11   here.  Because usually when we're talking a protective order

12   we're talking discovery.

13         In fact, I've done research.  There are not

14   protective orders granted under seizure orders.  There just

15   aren't.  So you're asking me for something in the context of

16   the seizure order where it really is a device to limit a

17   discovery tool.

18         MR. LEVINE:  We also asked -- and Ms. Birger can do

19   this -- we also asked in our original filing on this to --

20   there is Section 6(d)11.116 --

21         THE COURT:  116(d)(7).

22         MR. LEVINE:  (d)(7)?

23         THE COURT:  Yes.

24         MR. LEVINE:  Which does allow for limiting the

25   production of documents to confidential --

1          THE COURT:  Private, proprietary or privileged.

2          MR. LEVINE:  So those --

3          THE COURT:  But it doesn't say to relevance.

4          MR. LEVINE:  No.  But --

5          THE COURT:  Does not say to relevance.

6          MR. LEVINE:  But we are -- our position is, Your

7    Honor, that the business of H&H would hypothetically with

8    Holland Trading beyond the products is confidential and

9    proprietary to H&H with Holland Trading and beyond the

10   language of the order.  And so we are not --

11         THE COURT:  I am following what you're saying.

12         MR. LEVINE:  -- we are not trying to prevent the

13   discovery ultimately of the documents.

14          We're looking to move the playing field of the

15   dispute about what they get from an environment in which they

16   call the plays and we have no idea what plays they called in.

17   We're just looking at the documents from that environment to

18   one where they ask us to produce something.

19          We do a search.  We have a discussion about he

20   language of their request.  We asked them over and over again

21   for search terms.  They refused to give us proposed search

22   terms.

23         THE COURT:  And they say --

24         MR. LEVINE:  Their view is, Mr. Potter's view is

25   related and referring means everything.

21

```
1              THE COURT:  Mr. Levine, I know that you're very
2    passionate and it works well for you.
3              But let me just say, okay, they're saying that they
4    were willing to talk to you about search terms but that
5    you're insisting that the only search term be the marks.  And
6    so between the two sides there's an impasse.  And my whole --
7    how do I say this tactfully -- I have more cases than just
8    Abbott Labs.
9              MR. LEVINE:  We're aware.
10             THE COURT:  So I have to get a resolution here that
11   will work.  I can't have it be that every day's an Abbott
12   Lab. day.
13             And as much as I know that this is important to all
14   the players, in a certain way you're right.  This is just
15   maneuvering.  And they're saying you're holding the cards
16   because when you United Lex is giving you the documents,
17   you're not giving them information like you would be required
18   to in a privilege log as to why you're withholding the
19   document.  You're just not giving them.
20             MS. BIRGER:  Just to be clear, Your Honor, that's
21   not what we're doing.  Since the last conference, we actually
22   did generate a log.
23             They think -- what they want to know is they want
24   to see the documents and then decide.  But we told them the
25   vast majority at this point that we have been pulling out
```

1    have been until we resolve the date restriction issue -- and

2    we specifically identified for them by control number -- it's

3    only been withheld because it --

4                THE COURT:  Is it really all about the date and not

5    relevance?

6                MS. BIRGER:  No.  But more than half, probably more

7    than two thirds of the current stuff.  Some of the earlier

8    things --

9                THE COURT:  Wait.  Wait.  Wait.  Wait.  Half or two

10   thirds of the current stuff is being held --

11               MS. BIRGER:  Meaning that --

12               THE COURT:  -- because of date or relevance?

13               MS. BIRGER:  Let me -- yes -- no -- of date -- and

14   the reason why is this.

15               The Holland Trading stuff and other things were

16   front loaded.  They told United Lex to prioritize that stuff

17   clearly.

18               And so what we have been doing -- and we have given

19   them a log and we will update it every time -- just pending a

20   ruling from the court or an agreement on what they know what

21   we're doing is we're telling by document by document why we

22   withheld it.

23               And we say very specifically there is no mention of

24   the Freestyle marks anywhere in this document.  Or we said

25   this document predates October 9th, 2015  --

23

1          THE COURT:  But I don't buy the October 9th date.

2          MS. BIRGER:  Okay.

3          THE COURT:  And I'm telling you that right now.

4      That's the date that they filed for the injunction.  And

5      it may be a problem with their complaint, but I don't buy

6      that that's the relevant date for purposes of them getting to

7      see documents.

8          MS. BIRGER:  So, Your Honor, the issue is this.

9      They're telling us that they'll agree on a date

10     restriction, but it's got to go back several years.

11          And given the theory of their case, which is that

12     something happened after October 9th, 2015 that caused a

13     change in behavior there is zero reason to go back years from

14     that.  Even if you go back a few months, Your Honor, you

15     don't go back years.  There's nothing.  They don't have any

16     instance of any counterfeit sale until December, 2016.

17          THE COURT:  Look, can I be very direct with you?

18          MS. BIRGER:  You absolutely can.

19          THE COURT:  So it seems to me that your client had

20     terrible counsel out of the gate, and that there were

21     representations made both to plaintiff and to the court that

22     have now been undermined by other things that have happened.

23          And so you're fighting on both of these fronts.  Ms.

24     Birger.  I want to be clear with you about that.  You're

25     fighting the big behemoth, Abbott Lab, with Mr. Waters and

24

1    Mr. Potter, but you're also fighting that your client, H&H,

2    made representations in the other case that it sounds like

3    now have come back to bite them.

4              And so for me I can only go on what I'm being

5    given.  If you're saying that half or two thirds of the

6    documents are now being withheld because of the date, I don't

7    know what the date range is that you're withholding anything

8    before that October 9th, 2015.  If that's what this is all

9    about --

10             MS. BIRGER:  No.

11             THE COURT:  Again, I know that they allege that H&H

12   began the counterfeiting conduct in 2015.  That's what the

13   complaint says.  Mr. Waters, Mr. Potter --

14             MS. BIRGER:  They allege it began at the end of

15   sometime in 2016, but that the impetus for it started after

16   October 9th, 2015.  That's the allegation, not to interrupt.

17             The only thing -- the only reason I reference  the

18   why, Your Honor, is in response to the idea that they have no

19   reason why we're withholding documents.  It's simply not

20   true.  We told them.  And again we've only been withholding

21   them pending a resolution of this issue which we have been

22   pushing and trying to resolve.

23             THE COURT:  Except that, Ms. Birger, again, if this

24   was a discovery dispute, you'd be on the losing end of the

25   battle.

1          MS. BIRGER:  But it's not, Your Honor.

2          THE COURT:  So let them turn it into one and then

3     I'm saying what's the difference?

4          MS. BIRGER:  But, Your Honor, they haven't.  And

5     that's because they like it the way it is.  They like the

6     fact that they have complete control and we have no say in

7     it.  They could serve discovery requests.

8          THE COURT:  And, quite frankly, if they served the

9     discovery request and you're withholding them based on

10    relevance, what will the difference be?

11         MS. BIRGER:  But, Your Honor, the difference is

12    that when you have a discovery request, you don't withhold on

13    the basis of relevance.  You object on the basis of

14    relevance.  And then you have a meet and confer and you

15    resolve it or you bring a discovery dispute to a judge.  You

16    don't have this free-form then going to a vendor dealing with

17    --

18         THE COURT:  I understand that.

19         MS. BIRGER:  I know we keep circling.

20         THE COURT:  I understand that.  But I sort of feel

21    that we'll be at the same place.

22         MS. BIRGER:  I don't think we would, Your Honor.

23    And obviously we told them.  And particularly that you hit it

24    right out of box on the Holland Trading stuff.

25         I think, frankly, given the representation they've

1    made to us that we would be hard-pressed to say to them that

2    Holland Trading isn't relevant.  They told us they think that

3    Holland Trading has been selling our client counterfeit

4    goods.  So you wouldn't hear that from us.  We'd go away,

5    Your Honor.

6              THE COURT:  And I don't really understand why H&H

7    would be trying to protect the proprietary information of

8    somebody -- again, I understand it shouldn't be that I'm

9    putting the onus on you.

10             But since it's you moving for the protective order,

11   and since there is no protective order in the regular sense

12   under the federal rules -- and really we're dealing with a

13   section under the seizure order where it says that if it's

14   proprietary information -- but that's why I'm going back to

15   that.  Because it doesn't make sense to me that if H&H -- if

16   you're protecting your client and you're going to say they

17   were duped.  This other company was selling them things.

18   They had no idea they were counterfeit.  Why would you be

19   trying to protect that information?

20             MS. BIRGER:  Your Honor --

21             THE COURT:  I understand if there's other dealings

22   with Holland Trading and it's not about the Abbott Labs

23   product --

24             MS. BIRGER:  That's part of it.

25             THE COURT:  -- but if it's in conjunction in the

1    same e-mail that they're talking about three different

2    products, I don't see how you're going to avoid turning it

3    over.

4                MS. BIRGER:  So, Your Honor, I agree with you.  If

5    it were talking about FreeStyle and something else, then we

6    would have to turn it over.  At the very least maybe we'd be

7    having an argument about redactive.  But I understand that.

8                That's not what we're talking about here.  We're

9    talking about other documents.  And, frankly, we're talking

10   about whether it's within the scope of the seizure order for

11   them to get say the genesis of the relationship with Holland

12   Trading.

13               They wrote to Your Honor in this morning's letter

14   that they understand from deposition testimony that there was

15   a dinner at one point between representatives of Holland

16   Trading and representatives of our client.

17               And frankly, Your Honor, e-mails about that dinner

18   don't concern the FreeStyle marks.  They don't.  And so would

19   they get it in Rule 26?  They very well might.  They very

20   well might.  It's a different issue.

21               THE COURT:  Mr. Potter.

22               MR. POTTER:  We seem to be arguing about things

23   that just are outside the scope of reality.

24               We now know a little bit, but most of these e-

25   mails have been withheld.  That there was an extraordinary

1    meeting with people flying from Europe to Troy, Michigan.

2    One does not go from Europe to Troy, Michigan for any other

3    purpose but to meet with H&H.

4              And they met with the person who was in charge of

5    buying the test strips, and not a person who was at all

6    involved in any other of the products that they claim that

7    they might have possibly, hypothetically, could have

8    considered buying from this Holland Trading Group.

9              And we know there were e-mails because there's just

10   a little bit of information about it.  They just refer to

11   them.  What is the phrase they use?  Client development or

12   client relations.  That's all I know.

13             But I assume, because I asked and got no answer,

14   that these e-mails are, in fact, planning this extraordinary

15   meeting --

16             THE COURT:  Why does it matter?

17             MR. POTTER:  Well, because I want to know who was

18   at the meeting because I'm going to want to have to take

19   depositions.  I'm going to want to know who came from Holland

20   Trading.  I'm going to want to be able to pull out of that --

21             THE COURT:  And how about their point?  Why can't

22   you just ask those questions?

23             MR. POTTER:  Because when I asked them questions at

24   their depositions -- and I don't have documents -- they lied.

25   We have a long --

1          THE COURT:  You haven't taken the deposition yet

2     though.  Have you?

3          MR. POTTER:  All but I have of H&H.

4          THE COURT:  I understand in the other case you took

5     the deposition, not in the 17--

6          MR. LEVINE:  I mean, in --

7          THE COURT:  No, he didn't interrupt you.  You don't

8     get to interrupt him.

9          MR. POTTER:  In Mr. Gulaff's (ph), David Gulaff's,

10    I asked him at his deposition --

11         THE COURT:  But that was in the 15 case.

12         MR. POTTER:  Right.  But I asked him who he was

13    buying the international -- who he was buying domestic strips

14    from.  And he lied to me.

15         THE COURT:  Can I just ask why -- now knowing what

16    I know what you know, why can't you just serve requests on

17    them?

18         MR. POTTER:  Your Honor, we're concerned -- because

19    when we served requests in this case, we have not gotten the

20    responsive documents.  The work that United Lex has been

21    doing has been very good and it --

22         THE COURT:  I'm sure it has.

23         MR. POTTER:  Well, Your Honor, but that's the

24    thing.  We have gotten documents from them.  And in none of

25    those documents can they identify as being outside the scope

30

1    of the seizure order.

2              THE COURT:  Look, Mr. Potter, everybody wishes that

3    they could have a United Lex.  Okay.

4              And the only reason why you have a United Lex is

5    because of the type of case that allows for this

6    extraordinary power where the court has ordered them to be

7    the intermediary.

8              But I can assure you that Judge Amon had no idea

9    what search terms or how this would all unfold.  She was

10   signing an order that was presented to her in a case where

11   there were allegations of counterfeiting going on and it gave

12   you very broad, extraordinary power to go into H&H and take

13   their server.  And from that time forward, it's now my

14   problem.  Okay.

15             So both of you are talking about how, you know, on

16   your end of it, Unite Lex is doing a great job.  On their end

17   of it, that United Lex is unilaterally making determinations

18   that feeds you everything.  Because they're your vendor, they

19   want to be hired again and they have an interest in pleasing

20   you.  You didn't say all that but it's --

21             MR. LEVINE:  They actually have the information

22   about that dinner from the deposition testimony two weeks ago

23   in a --

24             THE COURT:  Who is they?

25             MR. LEVINE:  Mr. Abbott has it.

1          THE COURT:  Mr. Potter?

2          MR. LEVINE:  Mr. Potter asked Mr. Goldman about

3    that dinner.  Mr. Goldman testified about that dinner,

4    testified who was at that dinner, testified what that dinner

5    was about.  So they actually don't need the documents to find

6    out about that dinner.

7          THE COURT:  Well, that was just one example he was

8    saying of why he moved this information.

9          MR. LEVINE:  I understand.  But it's disappointing

10   to me, Your Honor, that misrepresentations are being made

11   about what the evidence is in the case.

12         THE COURT:  Let's not start with that.

13   Misrepresentations is not where you want to go with H&H as

14   your client.  Okay.  Yes.

15         MR. LEVINE:  Your Honor, the TRO in the case

16   provides that in addition to the documents that are produced

17   by United Lex -- and remember this is extraordinary.

18   Congress made findings in passed special legislation to deal

19   with people that sell counterfeits and that's why this is

20   different and that's why there is a United Lex.

21         THE COURT:  But remember that we put this off until

22   September to have the hearing.  So you have more than enough

23   time that you could make these requests if you don't think

24   that you're getting the information that you're entitled to.

25         MR. LEVINE:  Well, we also have -- the court also

1    issued a TRO that requires that these documents be produced

2    by H&H.  They haven't been produced by H&H.  H&H produced

3    some invoices with Holland Trading, but the e-mails and

4    documents behind it have only come to us through United Lex.

5              So we have -- they had the opportunity to produce

6    the documents.  They were required to produce the documents

7    in an expedited timeframe.  Obviously, they've had more time

8    to do it.  That hasn't worked.  We haven't gotten the

9    documents that way.

10             What we have been getting from United Lex are

11   documents that are not only exactly called for by the seizure

12   order -- and I'd like to, if I may, just read into the record

13   the paragraph, the operative paragraph on paragraph 6 of the

14   seizure order to show how broad it is in the seizure order

15   and how descriptive it is in the seizure order itself, that

16   if we pick up these meetings and other similar things that

17   are being held back, even if they don't specifically mention

18   FreeStyle marks on it.

19             And it had been working fine.  The problem we're

20   having here --

21             THE COURT:  You wanted to read into the record the

22   paragraph.

23             MR. LEVINE:  Yes.

24             THE COURT:  You wanted to read into the record

25   paragraph 6.

33

1          MR. LEVINE:  "Ordered that United Lex may review

2     all documents, communications, computer files and electronic

3     data seized pursuant to this order, to identify documentation

4     relating or referring in any manner to the manufacture,

5     promotion, publicity, advertising, receiving, acquisition,

6     importation, return, shipment, purchase, sale, offer for sale

7     for distribution of any merchandise bearing the FreeStyle

8     marks on a rolling basis, and shall provide those documents

9     to counsel for H&H."

10          And then there's a procedure for review of things

11     on the basis of privilege.

12          And all of the documents we've received not only

13     meet that criteria in a very narrow way, but they're also

14     relevant, it turns out, almost every one of them to the

15     actual counterfeiting itself.

16          And as we now are starting to piece together in the

17     few documents we have is that H&H had a constant

18     communication with Holland Trading and rejected their product

19     that were not stated in writing, but stated over telephone

20     calls based on the e-mails we should have a call about that

21     up until the time of the court's order being entered.

22          We think that if we can go through and see these

23     documents they will help us show and prove that this

24     counterfeiting was done willful.  This is a --

25          THE COURT:  Can I just stop you for one second?

1          ECF number 10 is an expedited discovery order that

2     says the parties may immediately serve discovery requests and

3     that there had to be an expedited response.  This was when we

4     still thought that we were going forward on the expedited

5     basis to the hearing.

6          Why can't we employ some discovery to meet this

7     need instead of arguing today, tomorrow, the next day, about

8     the terms and whether you're getting what you're supposed to

9     get?

10          MR. POTTER:  Your Honor, my concern is given the

11     history of discovery in this case -- and this is something

12     that Congress thought about in passing this legislation -- is

13     that we cannot rely upon H&H to make production.

14          THE COURT:  Let me just say H&H was represented by

15     different counsel --

16          MR. POTTER:  They still are represented by that

17     counsel.  They are counsel of record.  They attended the

18     deposition.  They are on the telephone calls.  They're not

19     here today.

20          THE COURT:  But et me just say to you because this

21     has now been put off for some time, the urgency that you're

22     coming, the frequency and the urgency that you're coming to

23     me about the case doesn't seem to serve the parties well.

24          I do understand, Mr. Potter, what your argument is;

25     that they did not produce what they were supposed to produce.

1    And that again you're saying that the seizure order affords

2    for a much broader production than they believe it does.

3         I also understand that because United Lex took the

4    server that you have no problem getting the documents from

5    United Lex.  You only have a problem because there's a

6    process by which it has to go through Ms. Birger and Mr.

7    Levine's hands so they're holding up the documents.

8      I got the whole gist of what is going on here.  My

9    problem here is I understand that it's an extraordinary

10   mechanism that Congress has put into hands of plaintiffs like

11   your clients.

12        But I also understand that by putting off any

13   hearing on that TRO until September, that that built in a

14   little more time for the parties to get at whatever it is

15   that they need to get at here.

16        You already have enjoined them from selling any of

17   the product.  They're not getting any more product to put on

18   the market.  So the urgency that they may be flooding the

19   market with counterfeit goods in your client's name has been

20   forestalled.

21        So my real question to you is if we can't get the

22   parties to agree on terms, knowing that Ms. Birger is making

23   the argument to me that if this was made as a discovery

24   request they wouldn't have any legs to stand on.  She said

25   that.  She didn't say it that way.

1          MS. BIRGER:  Not quite that way, Your Honor.

2          THE COURT:  But she said if you had made the

3    discovery request for all the documents relating to the H&H

4    client relations with Holland Trading --

5          MR. POTTER:  Well, she said she'd object to it, and

6    then wed be back here.

7          THE COURT:  But she wouldn't get anywhere with me.

8          MR. POTTER:  Okay.

9          THE COURT:  She wouldn't get anywhere with me.

10          Her one point that is well taken with me, but I

11   have nothing I can do, is that protective orders are not

12   generally written about in this realm and in the realm of a

13   seizure order.

14          And it's probably because the seizure orders are

15   going to be put to the test through the hearing in a very

16   short period of time.

17          And so these sort of arguments back and forth just

18   don't happen with any frequency, because either the company I

19   guess has shut down after the seizure and they put their

20   hands up or they just are not moving for -- there are no

21   cases on protective orders within this area of a seizure

22   order.

23          So I guess it doesn't help or hurt you in any way.

24   I'm just saying that they're asking for something that I

25   don't find any basis for in the case law.

37

```
 1          But on the flip side, I understand their argument

 2     that there is a difference between discovery and seizure.

 3     And what you're entitled to in the seizure may or may not be

 4     everything that United Lex is making this determination is

 5     within the scope.  I don't know.  I haven't looked at any of

 6     the documents.

 7          So I could do a couple of things.  I could force

 8     you to go back to the table after this conversation where

 9     they know that I'm not going hold up that date.  I don't know

10     what the right date is, but I'm not going to hold up that

11     date as the right date, the date that you filed.

12          Two, I've already said that I believe that the e-

13     mails or the relations between H&H and Holland are fair game

14     and that they shouldn't be throwing up roadblocks and saying

15     that they want to protect the confidentiality of that.

16     Because I think that that -- even though it may in some

17     respects have more basis in 15 United States Code 1116(d)(7)

18     because that refers to confidential, private, proprietary or

19     privileged information.  I really can't see why they would

20     want to protect somebody who's selling them counterfeit

21     goods.

22          But that being said, my inclination is to throw you

23     back to each other to get this worked out in a way that there

24     are search terms built in that both sides may not be happy

25     with, but could agree to.
```

```
1              You don't think it's going to work, Mr. Waters?

2      That's what your face says.

3              MR. WATERS:  The difficulty is is the documents

4      that are being withheld.

5              What we can agree would not get picked up on search

6      terms because all they are are discussions about the stuff

7      that's coming.

8              So until we could see these documents, know what it

9      is, understand their relevance, and we can do other search

10     terms that would pick up similar documents and things like

11     that --

12             THE COURT:  So what do you think?  We're going to

13     raid as a search term "the stuff"?

14             MR. POTTER:  No, that's the problem.  Because the

15     way it works, Your Honor, when you or I are reviewing our own

16     documents on line, you start broad and you say, my goodness,

17     there's now a series of transactions here.  And you look to

18     see the e-mail dealing with the transactions.

19             You've got deliveries and you say, oh, my goodness,

20     these are deliveries are going through such and such a

21     freight forward, are located in Florida.  And then they're

22     setting up escrow payments and other discussions of getting -

23     - how we're going to get this stuff cleared through customs,

24     so on and so forth.  This is all about the same transaction.

25             And what we assume is going on with United Lex is
```

1    they are doing -- as we told the court they would -- in real

2    time figuring out what these transactions are and providing

3    their documents.

4              As far as we know, those are the documents that are

5    being held up.  If we can see the documents that they're

6    holding on the grounds of relevance, we can figure out where

7    this has gone wrong if, in fact, they're not part of

8    (indiscernible). And these are not privileged documents.

9    These are issues of relevance.

10             We're happy to enter into any sort of protective

11   order so we can understand what it is that we're trying to do

12   here.  If we just say documents that use the magic word

13   FreeStyle we're not going to pick it up and we know that.

14             MS. BIRGER:  Your Honor, Mr. Potter just made our

15   argument for why this should be done under Rule 26.  Because

16   when parties are served with discovery requests, they start

17   broad.  They look at their own documents.  They talk to their

18   client.  They find the relevant documents.  They turn them

19   over.

20             The problem is --

21             THE COURT:  Ms. Birger, I assume that all of the

22   documents that you have gotten from United Lex will

23   ultimately have to be turned over.

24             MS. BIRGER:  I'm not sure that's quite right.

25             THE COURT:  Maybe it isn't.

1          MS. BIRGER:  Many of them may be withing the scope

2    of Rule 26, but there are documents that are not about

3    Abbott.

4          MR. POTTER:  Your Honor, we need to see those

5    documents so we can know what's wrong. We'll look at a

6    written copy in their office.

7          This is a seizure order. They are unilaterally

8    refusing to let us see documents seized on their say so.

9    Their log is a joke.  It didn't have the date of the document

10   or anything else.

11         THE COURT:  And I just ask though -- so these have

12   been produced since May on a rolling basis.

13         How much more is there to be produced?

14         Again, I'm asking in quantity, because a server

15   could have unlimited amount of information on it and this has

16   been produced since May.  Am I correct?  Since May there's

17   been --

18         MS. BIRGER:   Yes, Your Honor.

19         THE COURT:   There's been rolling documents.

20         MS. BIRGER:   Yes.

21         And, Your Honor, the answer from our perspective is

22   we don't know because what's happening -- and, again, this is

23   the problem is that when Mr. Potter and Mr. Waters have a new

24   theory, a new idea, a new lead, they go back to United Lex

25   and United Lex is doing something and then a new rolling

1    production comes out.

2              THE COURT:  But I don't really care about that, Ms.

3    Birger.  And what you're telling me on both sides is putting

4    me in the position that now you're going to produce all the

5    documents to me and then I'm going to say whether or now they

6    should be turned over, and God knows that's not what I want

7    to do.

8              MS. BIRGER:  Nobody wants to impose that on you,

9    Your Honor, but I'm trying to forthrightly tell the court,

10   because we don't know what they're looking for and they've

11   been unable in our meet and confer to come up with search

12   terms, because as Mr. Potter just candidly acknowledged, he

13   wants what he wants.  But he can't define it and he wants to

14   keep going back to the well and poking around and looking for

15   things.

16             But on the flip side of that argument is only

17   because this has come up in a seizure context, where it's

18   their vendor that's getting the documents and turning them

19   over to you, if it was you looking for the very same

20   documents, you wouldn't have -- I said a leg stand on.

21             MS. BIRGER:  Your Honor, we wouldn't be filing.

22             THE COURT:  You would not have a reasonable basis

23   to be withholding them.

24             So, again, I'm saying why then are we going through

25   this exercise in futility?

42

1          MS. BIRGER:   And the answer is this, Your Honor.

2     The answer is this.   There is a certain lack of trust.  I

3     understand Abbott's lack of trust of my client, but

4     similarly, Mr. Potter and Mr. Waters have sued my client on

5     behalf of many other clients, not just Abbott, over the

6     years.

7          And so there is a reluctance to turn over documents

8     that are not responsive to document requests with letting

9     them have free access.   That's it, Your Honor.

10          THE COURT:  And Ms. Birger, if you looked at -- and

11     I don't know how many there are, but let's assume there are a

12     hundred documents, just to have a round number.

13          MS. BIRGER:   There's fewer, but yes.

14          THE COURT:  Okay.  If you were to look at those

15     hundred documents and tell me that you're not turning over 20

16     of them because they don't have anything to do with FreeStyle

17     and they're about H&H dealing with other companies, or other

18     brands, or other merchandise, I could accept that.

19          But that's not what you're saying.

20          MS. BIRGER:   That's not. I'm telling you there are

21     some documents that fit that description and then there are

22     other documents about say setting up a dinner with Holland

23     Trading, which we do not talk about the FreeStyle marks and

24     we think they're outside the scope of the seizure order.

25          If there was a Rule 26 request for all documents

1       concerning communications with Holland Trading, we would have

2       turned them over.

3               THE COURT:  A Rule 34 request, not Rule 26, right?

4               MS. BIRGER:  Sure.  Sure.

5               THE COURT:  34.  Why can't we just do that?

6               MR. POTTER:  Sure. We will run into problems if we

7       go 30 days out and we get objections, because then we won't

8       have the documents in time for the hearing, but we'll deal

9       with that at the time.

10              THE COURT:  I thought the hearing's in September.

11              MS. BIRGER:  It is.

12              THE COURT:  And we're in July now.  So if my 30

13      days is right -- and you have to admit, I've given you quick

14      access to the court if there's any problem to resolve.

15              MR. POTTER: Yes, Your Honor.

16              THE COURT:  And I do have a good memory.  Nothing

17      else, but a good memory.

18              So I will remember today's conversation.

19              MR. POTTER:  And we appreciate that, Your Honor.

20              THE COURT:  The expedited discovery order, by the

21      way, says a three-day turnaround.

22              And, again, I'm not saying that we should go under

23      the expedited discovery order, because the expedited

24      discovery order was done in light of the fact that the

25      hearing was going to be held expeditiously, and now it's been

```
1    put off until September.

2              But you see I think that the amount of energy

3    that's going into this is not a good use of the H&H dollar.

4              Again, I understand that they already made their

5    bed a little bit before you and Mr. Levine came in, so I

6    can't make anything for them about that, the mistrust between

7    the parties.

8              But I am in the position to say that I don't think

9    you're going to be able to hold onto the documents --

10             MS. BIRGER:   We understand.

11             THE COURT:  -- because it's talking about a dinner,

12   when there's other information that they have that that

13   dinner was somebody coming from Europe to meet with somebody

14   in Troy, Michigan about buying test strips.

15             I don't think you're going to be able to --

16             MS. BIRGER:   We understand, Your Honor.  We

17   understand.  And you will not see us back in this courtroom

18   on a discovery request about those documents.

19             I also have a good memory, and I know the court

20   does, and you just heard me say that.

21             THE COURT:  Okay.  Good.  Yes, Mr. Waters.

22             MR. WATERS:  So, Your Honor, I'll just point out

23   page 5 of the seizure order already has a -- basically a

24   document request.

25             It's an order for them to produce documents on
```

1     their own related to FreeStyle.  So that's already there.

2     That's already an obligation.  They simply put that process

3     on hold during this dispute. I think it's time for them to

4     take it off hold and start producing those documents.

5               Anything not covered on page 5, then we can discuss

6     --

7               THE COURT:  Again, I'm not looking to make more

8     paperwork for your minions.  I'm not.

9               And I understand that part of the argument is

10    whether it's related, or referred to, or any of that,

11    because, again, the dinner with the person from Europe, I

12    don't know if there are specific emails that you're really

13    interested in that don't say a thing about FreeStyle and you

14    still would want that email.

15              So what I'm trying to say here is I think the

16    writing on the wall, Mr. Levine and Ms. Birger, that your

17    client is not going to be able to withhold these documents.

18              I get your point about the unilateral, you know,

19    Unitex -- United Lex.  God, I'm coming up with new names.

20    Not a bad one.

21              MS. BIRGER:   I think Unitex is actually a company.

22    I feel like they make gloves or something.

23              THE COURT:  Maybe.

24              But I understand what your point is that they

25    shouldn't have the extraordinary power just because Judge

1    Amon signed a seizure to just feed everything to Mr. Waters

2    and Mr. Potter.

3           But I think that you're in a -- you're in a bit of

4    quicksand here on the argument that you're not going to have

5    to eventually turn these documents over.

6           I don't think there's going to be any argument down

7    the road, if they make these requests under 34 that

8    documents, emails and they already have your listing of them.

9           So I understand that you think it's a horse of a

10   different color because of the distinction between the

11   seizure and discovery, and I do understand that there's a

12   live implementation of the seizure order still going on.

13          And I've asked both sides how much more is there

14   and nobody is able to tell me that.  Is there a --

15          MR. POTTER:  Our sense is there's very little. The

16   amount that they've produced so far, in terms of physical

17   document --

18          THE COURT:  Is there a way that we would ask United

19   Lex to tell us, since they have the server and that way I

20   have a better understanding of whether or not we are fighting

21   over a limited universe of documents, or it's going to keep

22   going.

23          MR. WATERS:  Your Honor, part of the problem here

24   is we haven't told United Lex -- (indiscernible) says

25   FreeStyle, dump it on us.  And then they get how many

1    thousands of documents and they have to review it for

2    privilege.

3              We've explained -- we've said this to Judge Amon

4    the first day.  We explained our theory of the case.  We

5    think Holland Trading's the counterfeiting so, of course,

6    they look for Holland Trading related FreeStyle documents.

7              If we were to say give us every document that says

8    FreeStyle Abbott on it, then we'd have a huge dump.

9              I guess we can do that, but we haven't been going

10   that route. We've been trying to be targeted so that we don't

11   just capture every document on the server.

12             THE COURT:  But both of you are telling me the same

13   thing, Mr. Waters.  That you have not given them search terms

14   because you haven't been able to agree to search terms.

15             And you're saying it would be too broad, and

16   they're saying that's the only -- or least your letter is

17   saying that's the only search terms that they'd agree to, is

18   that it has to have the FreeStyle mark.

19             And I'm saying I don't know what the answer is, but

20   I think that there is a way to run around the backhand here,

21   to do a forehand stroke, which is to serve the document

22   request --

23             MR. WATERS:  Okay.

24             THE COURT:  -- since you already have the list of

25   what they have. They've already said that they understand and

48

1       will remember that I'm not going to uphold them --

2                   MR. WATERS:  Got it.

3                   THE COURT:  -- from turning over those documents.

4                   But I would like if there's any more that's going

5       to come up regarding the seizure order, I would like

6       something, whether it's an affidavit or it's you getting the

7       information from your company, United Lex, that I know what

8       are we dealing with here, because, again, I'm not saying that

9       you haven't come to me on a worthwhile basis.

10                  Both sides are using my time judiciously. I don't

11      have any problem with both sides coming to me.

12                  I do have a problem though because I'm in the dark.

13      I don't know how many more documents they have to dump or how

14      much more information. I've given you clear indication that I

15      would not restrict it the way that you would want me to

16      restrict it.  That date is not going to be the operative

17      date.

18                  And as far as the distinction, which I do

19      understand the argument and I did my own independent research

20      and did not find any cases regarding protective order and

21      seizures.

22                  And I believe that's because usually the seizure

23      order is quickly put through to a hearing and here's a delay

24      that's been agreed to by the parties.

25                  That's the only thing that I can really come up

1    with here.

2            MR. LEVINE:  Your Honor, if they were in the nature

3    of Rule 34 requests, then both sides would know what

4    documents are being sought and there could be a professional

5    discussion about what's produceable and what's not.

6            And if Your Honor --

7            THE COURT:  But Mr. Levine, it's not going to be a

8    relevance objection.

9            MR. LEVINE:  I understand.

10           THE COURT:  And so all of these documents that are

11   listed in -- I forget whether it's Exhibit A or whatever the

12   attachment was to the letter today, the likelihood is you're

13   not going to be able to withhold those and object.

14           MR. LEVINE:  Your Honor, I hear Your Honor.

15           THE COURT:  Okay.

16           MR. LEVINE:  But the fact of the matter is that we

17   don't know what the limits of the word "relevance" are now

18   and we don't know what the limits are of Mr. Potter's and --

19   request.

20           And so we've heard the court --

21           THE COURT:  Well, I --

22           MR. LEVINE:  We understand --

23           THE COURT:  I also --

24           MR. LEVINE:  We understand what the court --

25           THE COURT:  -- I also do not want to make you give

1    another log because then we're going to be fighting about the

2    log instead of getting the documents.

3              So look. I'm not going to their end result, which

4    is give them all the documents without waiving any of your

5    objections and let them come and be able to argue. I'm not

6    jumping to that.

7              But I'm also giving you as clear an indication as I

8    can that if they're making these requests and you're

9    withholding them because you don't think they're relevant,

10   that will not be upheld.

11             And so I'm saying -- and I do understand and I want

12   to say to Mr. Waters and Mr. Potter so Mr. Levine, and Ms.

13   Birger, I think you acknowledge are worthy opponents on a

14   case like this.

15             And if you had a client like H&H and you came in

16   when they came in on the case, they have to be able to do

17   something to put their finger in the dike.

18             And so, again, I believe that their argument that

19   the seizure order did allow for everything to be seized, but

20   it didn't give United Lex full, unfettered discretion about

21   everything gets turned over to Mr. Potter and Mr. Waters.

22   That's why the documents first go through Mr. Levine and Ms.

23   Birger. That's what the seizure says.

24             And I'm saying that I'm not going to be able to

25   withhold their relevance objection, but I also know, because

51

1    we have this on file, expedited discovery order, which I am

2    telling you you should negotiate because a three day

3    turnaround doesn't seem to be fair and in everybody's

4    interest.

5            But I don't think that we have to keep fighting

6    about it as the seizure order, unless somebody's going to

7    tell me that there is some imminent danger right now to the

8    public, and that it must be that everything that was seized

9    gets turned over immediately for you to view in order to

10   protect the public. Nobody's telling me that.

11           I think that we can handle it as a discovery

12   dispute and if they made the same protective order

13   application in a discovery dispute on the basis of relevance,

14   I'd be able to deny their motion.

15           MS. BIRGER:   We're find with that.

16           MR. LEVINE:   Thank you, Your Honor.

17           THE COURT:   So I guess I'm just kicking the can

18   down the road, but I'm giving you both indications of where

19   the court would come out and especially on the date, I've

20   been clear with you, that I do not agree that the date of the

21   filing is the date.

22           And I've also told you that the 2015 case wasn't

23   actually limited to 2014. It was that H&H in their random

24   sampling had 6,000 documents from 2014 so we didn't believe

25   that they needed to turn over the rest at that time.

1          THE COURT:  Is there anything else that needs to be

2     addressed on behalf of Abbott today?

3          MR. WATERS:  No, Your Honor. We'll promptly serve

4     the discovery requests and we will be talking to our

5     adversaries about the timing of objections and then

6     responses.

7          THE COURT:  And, again, I don't think that -- I

8     don't think there's going to be a different result, but to

9     fight about search terms, just doesn't sound to me to be an

10    efficient use of our resources at this time.

11         Anything else on behalf of H&H today?

12         MS. BIRGER:   No, Your Honor.

13         THE COURT:  This matter is adjourned.  Thank you.

14         MR. WATERS:  Thank you.

15         (Proceedings concluded at 4:55 p.m.)

16    I, CHRISTINE FIORE, court-approved transcriber and certified

17    electronic reporter and transcriber, certify that the

18    foregoing is a correct transcript from the official

19    electronic sound recording of the proceedings in the above-

20    entitled matter.

21

22    *Christine Fiore*

23    _____          July 18, 2017

24       Christine Fiore, CERT

25          Transcriber