UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
ABBOTT LABORATORIES, ABBOTT DIABETES
CARE INC., and ABBOTT DIABETES CARE
SALES CORPORATION,

                                  Plaintiffs,                      **ORDER**
                - against -                       **17 CV 3095 (CBA)(LB)**

H&H WHOLESALE SERVICES, INC.,
HOWARD GOLDMAN, DAVID GULAS, and
JOHN DOES 1-10,

                                  Defendants.
----------------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      By letter-motion dated November 6, 2017, plaintiffs Abbott Diabetes Care Sales Corporation, Abbott Diabetes Care Inc., and Abbott Laboratories (collectively, "Abbott") argue that defendants H&H Wholesale Services, Inc. ("H&H"), Howard Goldman, and David Gulas committed discovery fraud by intentionally withholding documents in its Court-ordered February 2017 production to Abbott in Abbott Labs. v. Adelphia Supply USA, No. 15 CV 5826 (CBA) (LB) ("Abbott I"). ECF No. 63.[1] Based on H&H's alleged discovery fraud, Abbott requests that "the Court find that the crime-fraud exception applies to all otherwise privileged or work-product documents and communications concerning H&H's compliance with this Court's . . . Order to produce documents." Id. at 18. On November 14, 2017, the Court directed H&H to file a response to Abbott's motion and on January 25, 2018, H&H filed their Memorandum in Opposition to Plaintiff's Motion, ECF No. 80.[2] Abbott filed a reply, ECF No. 81, and H&H filed a sur-reply, ECF No. 94.

---

[1] Unless otherwise noted, all references are to docket entries in the instant matter, Abbott Labs v. H&H Wholesale Service, Inc., No. 17 CV 3095 (CBA)(LB) ("Abbott II").
[2] The parties stipulated to extend the briefing schedule. ECF Nos. 72, 77.

1

Abbott argues that "H&H intentionally removed from its February 2017 production documents it was ordered by this Court to produce, including every communication (and an invoice) concerning the counterfeiter Holland Trading, as well as every document concerning the individual defendant Howard Goldman." ECF No. 63 at 2.  H&H's February 2017 production "consisted of only **315 documents**." Id. at 7 (emphasis in original).  However, the "**re-production of the 2014 H&H documents contained more than 3,500 documents** . . . ." Id. (emphasis in original).

H&H submits that the February 2017 production "was a poorly executed effort, overseen by counsel with apparently inadequate experience in electronic discovery, and further plagued by technical problems." ECF No. 80 at 11.  H&H asks this Court to find that the large disparity in withheld documents "points to a far different conclusion: that the entire process was defective, not that particular, individual, harmful emails were selectively omitted." Id. at 12.

On February 22, 2018, I ordered H&H to produce documents containing allegedly privileged communications to the Court for *in camera* review. See Zimmerman v. Poly Prep Country Day School, No. 09 CV 4586 (FB)(CLP), 2012 WL 2049493, at *9 (E.D.N.Y June 6, 2012) ("[*I*]*n camera* review is an appropriate means for the Court to determine whether allegedly privileged communications fall within the exception.").  At a conference on February 27, 2018, the parties orally argued their positions regarding the crime-fraud exception. On March 2, 2018 H&H produced the documents for *in camera* review.

For the reasons set forth herein, Abbott's motion is granted in part and denied in part.

## BACKGROUND

1. The February 2017 Production in Abbott I

On October 9, 2015, Abbott filed a trademark diversion action against a long list of pharmacies, distributors, importers, and online sellers of the international version of Abbott's FreeStyle Diabetes test strips.[3] See Abbott I. On January 13, 2017, I held a conference in Abbott I to address various discovery issues between Abbott and the many defendants. In order to ensure that the discovery requested by plaintiff was proportional to the needs of the case, I "directed defendants to review all formal and informal communications regarding defendants' purchases and sales of international FreeStyle test strips in 2014, including emails, text messages, purchase orders, delivery invoices, and check/wire transfers" and to provide the Court with the "total number of responsive documents." Abbott I, ECF No. 925. Defendants' responses reflected documents numbering between 2 and 1000. Abbott I, ECF Nos. 932-947. H&H was the one outlier. Abbott I, ECF No. 933. H&H informed the Court that "there are approximately 6,000 responsive documents." Id.; see also Abbott I, ECF No. 1075 (Abbott states it is "unsurprising that H&H has a larger number of responsive documents" because "H&H is by far the largest diverter of the named defendants, having purchased and sold over 25 million diverted test strips since 2009[.]").

At a January 27, 2017 status conference, I found Abbott's production request reasonable and directed all defendants to provide Abbott with responsive documents from 2013, 2014, and 2015. Abbott I, ECF No. 963 at 1. However, in light of the large volume of responsive documents identified by H&H, and counsel's argument that the production request was unduly burdensome,

---

[3] For a fuller recitation of Abbott I, see 15 CV 5826, ECF No. 892.

I limited the timeframe and ordered that H&H need only produce responsive documents from 2014. Id. at 1 n.2.

The production was coordinated by Andrew Sweet ("Sweet"), H&H's General Manager, and Jason Yert ("Yert"), H&H's lead counsel from Kerr, Russell and Webber PLC ("Kerr Russell").[4] See H&H's August 31st Letter to Abbott annexed to ECF No. 63 as Exhibit V, ECF No. 63-22 ("Jason Yert of Kerr Russell worked closely with Andrew Sweet to review the emails located by the search terms."). By letter dated March 22, 2017, Abbott raised several issues regarding H&H's production, including that H&H produced the aforementioned documents "by printing them in hard copy, scanning them all together, and producing them as a single, 1941-page PDF file." Abbott I, ECF No. 1075. On March 24, 2017, the Court held a conference and ordered H&H to produce an electronic copy of the 2014 emails. Abbott I, ECF No. 1080.

2. The Abbott II Seizure Order

While discovery in Abbott I proceeded, the instant action, Abbott II, was filed alleging that H&H trafficked in counterfeit FreeStyle test strips. On May 24, 2017, the Honorable Carol B. Amon issued a Seizure Order allowing Abbott to enter H&H's premises and seize "all products bearing any of the FreeStyle Marks . . . and all documents, records and communications whether such information is stored in written or digital form related to or referring to merchandise bearing the FreeStyle marks . . . ." Abbott II Seizure Order, ECF No. 11 at 1-2. "Pursuant to the terms of the seizure order, a third-party vendor, UnitedLex, took custody of copies of H&H's emails and

---

[4] Kerr Russell is no longer counsel for H&H. Fox Rothschild LLP and Kerr Russell were H&H's original counsel on this matter. See Abbott I. On June 6, 2017, H&H substituted Alan Levine of Cooley LLP ("Cooley") as counsel in replace of Fox Rothschild LLP. Abbott I, ECF No. 1131. On August 3, 2017, H&H substituted the law firm of Cohen & Gresser LLP ("C&G") as counsel to replace Cooley. Abbott I, ECF No. 1163. On August 14, 2017, H&H likewise substituted C&G as counsel to replace Kerr Russell. Abbott I, ECF No. 1173. On January 10, 2018, Judge Amon granted C&G's motion to withdraw as counsel. Abbott I, Docket Entry, dated Jan 10, 2018. On January 10, 2018, Milton Springut of Springut Law, P.C. filed a notice of appearance on behalf of H&H. Abbott I, ECF No. 1249.

electronic files." Abbott I, ECF No. 1147 at 2. United Lex "searched for responsive documents and provided them to H&H for a privilege review before providing them to Abbott." Id. H&H "took the position that documents from 2014 were irrelevant to the counterfeiting action, and withheld from production any further emails from 2014." Id. However, prior to H&H's withholding the documents, Abbott obtained several emails from 2014. Id. Problematically, the emails Abbott obtained from the Seizure Order were not produced in Abbott I despite the emails "clearly [falling] within the scope" of the Court's January 27th Discovery Order in Abbott I. Id.

On July 6, 2017, Abbott moved to compel H&H to produce all documents responsive to the Court's January 27th Order as well as discovery regarding H&H's failure to produce the documents as originally ordered. Id. Abbott argued that H&H's February 2017 production failed to include "**a single document concerning Holland Trading Company, or a single email to or from Howard Goldman.**" Id. (emphasis in original). These omissions raise great concern "in light of Abbott's allegation in [Abbott II] that H&H turned to counterfeit FreeStyle strips in order to circumvent the Court's [Temporary Restraining Order] and preliminary injunction prohibiting them from trafficking in international FreeStyle strips."[5] Id. at 5. In response to Abbott's allegations, H&H proffered that the omission was purely a technical error. Abbott I, ECF No. 1152. On July 12, 2017, the Court directed H&H to re-run the search and produce the documents to Abbott. Abbott I, ECF No. 1156. Cooley, H&H's counsel at the time, "re-produced the 2014 documents without the involvement of its client or former counsel, by transferring H&H's email server to a private vendor and reviewing the documents itself." ECF No. 63 at 7. The "**re-production of the 2014 H&H documents contained more than 3,500 documents – over *ten***

---

[5] "From the omitted emails it is now clear that in 2014, H&H and Holland Trading exchanged a number of emails concerning H&H's purchase or potential purchase of international FreeStyle test strips, and that H&H at minimum issued a 2014 purchase order for such strips." Id. at 4 (emphasis in original).

*times* **as many responsive documents as H&H originally produced."** Id. (emphasis in original). The Court also directed H&H to produce an affidavit from TransPerfect Legal Solutions, the vendor contracted by H&H to analyze the alleged technical glitch. Id. On August 21, 2017, Abbott and H&H stipulated to several matters regarding various discovery, including the rolling production of documents from 2013 and 2015 as well as the production of a written report analyzing H&H's February 2017 production. Abbott I, ECF No. 1189.

    3. The TransPerfect Report and H&H's Investigation

Joseph Pochron ("Pochron"), the Director in the Forensic Technology & Consulting division at Transperfect Legal Solutions prepared a report regarding the alleged 'technical glitch' that resulted in H&H's deficient production. See Pochron Affidavit, annexed to Abbott's Letter Motion as Exhibit U, ECF No. 63-21. Mr. Pochron was asked to "provide an affidavit explaining whether and how a technical issue may have caused certain emails to be omitted from the [February 2017] document production." Id. ¶ 8. Through his investigation, Mr. Pochron determined the following:

- Beginning in March of 2015, H&H used two email platforms: Microsoft Office 365 and Barracuda Message Archiver. Id. ¶ 10.

- Prior to March 2015, the company's email platform was Microsoft Exchange 2007. Id. ¶ 11.

- When H&H migrated "to its two new platforms, all available emails in Exchange 2007, including emails from 2014, were first exported to PST files and subsequently ingested into Barracuda." Id. "[A] separate Microsoft software was used to sync and migrate the same emails stored in Exchange 2007 into Office 365." Id.

6

- Barracuda has two types of user accounts: Administrative and Auditor. The Administrative account has "elevated privileges" while the Auditor account is recommended "for employees requesting to run searches or performing other routine tasks." Id. ¶ 13.

- Mr. Sweet was given an Auditor account. Id.

- Mr. Sweet's Auditor account only specified two e-mail domains for searching: hhwholesale.com and cbgsave.com. Id. ¶ 14. "Put another way, once the Auditor account was established the user of the Auditor Account . . . could only view emails stored in Barracuda in the email address . . . contained either the 'hhwholesale.com' or the 'cbgsave.com' domain." Id.

- Mr. Sweet "searched for responsive emails only in Barracuda, and did not perform a search in Office 365." Id. ¶ 18.

- Mr. Pochron conducted the same search that Sweet conducted using both an Auditor and an Administrative account. Id. ¶ 22. "The search in the Administrative account returned 1737 messages, while the search in the auditor account returned just 1540 messages." Id.

- Mr. Pochron reviewed the additional 197 messages in the Administrative account and determined that "the vast majority of those messages had been omitted from the Auditor account search because the[y] . . . did not contain either the 'hhwholesale.com' or the 'cbgsave.com' domains." Id. ¶ 23. However, Mr. Pochron also noted that "[a] handful of the 197 omitted messages do not appear to have been excluded from the Auditor account because of a missing 'hhwholesale.com or 'cbgsave.com' address." Id. n.1.

- Mr. Pochron also reviewed emails which Abbott identified as having been omitted from the February 2017 production. Id. ¶ 25. Four of the six emails were excluded from the Auditor account search.[6] Id. ¶ 26. Mr. Pochron states that the emails were excluded because they did not contain the correct domain name. However, some of the emails included messages with the 'hhwholesale.com' domain, and those emails should have been "visible in Mr. Sweet's auditor account." Id. ¶ 28. However, they were not visible. Mr. Pochron could "not precisely determine why the emails were not visible in the Auditor account[.]" Id.

- Mr. Pochron concludes that "the occasional failure of Exchange" to resolve the domain issue "combined with the restrictions placed on the Auditor account . . . explains why some emails were omitted . . . ." Id. ¶ 30 (emphasis added). He also states that the issues described in his affidavit would not have affected a search run through Office 365. Id. n. 3.

C&G, as counsel to H&H, conducted an internal investigation into the production. See ECF No. 63-22. The C&G investigation alleges that "[o]f the hundreds of emails mistakenly omitted from production, the issues detailed in the Pochron [A]ffidavit account for all but approximately 60 of them." Id. at 2. As the 'technical glitch' could thus no longer be the sole source of the deficient February 2017 production, H&H pivoted to blame its prior counsel, Kerr Russell, for the other omitted emails. Specifically, the C&G investigation determined that "the smaller set of documents that were not explained by the Pochron [A]ffidavit, Kerr Russell represented that they were omitted due to two inadvertent errors in the early 2017 production: 1) a technical issue related to emails with attachments in the Concordance system; and 2) an issue with the deduplication of

---

[6] The Pochron Affidavit makes no mention of why the other two emails were excluded.

documents, wherein some emails were removed from the production even though they were not necessarily duplicates."[7] Id.  The C&G investigation concluded that "[n]othing . . . indicates that [the set of documents omitted from the production] is due to anything other than inadvertent error." Id.

Abbott takes great issue with the Pochron Affidavit and the C&G internal investigation. The crux of Abbott's position is that the alleged "technical error[s] . . . cannot explain why H&H failed to produce the communications with Holland Trading." ECF No. 63 at 14.  Further, "**none** of the omitted Howard Goldman emails could have been affected by the supposed 'technical error[.]" Id. (emphasis in original).  Rather, "[s]everal of the omitted Holland Trading and Goldman documents **did** hit H&H's concededly unacceptable search terms and were **not** the type of documents potentially affected by the 'technical glitch' H&H has proffered." ECF No. 81 at 1. (emphasis in original).

## DISCUSSION

"The attorney-client privilege is the 'oldest of the privileges for confidential communications known to the common law,'" In re Richard Roe, Inc., 68 F.3d 38, 39 (2d Cir. 1995) (quoting Upjohn Co. v. United States, 499 U.S. 383, 389 (1981)), and "is designed to promote unfettered communication between attorneys and their clients so that the attorney may give fully informed legal advice[,]" id. (citations omitted).  However, "there is no such interest when the communications or advice are intended to further the commission of a crime or fraud." Id. at 40; see Zimmerman, 2012 WL 2049493, at *6 ("The crime-fraud exception to the attorney-client privilege strips the privilege from attorney-client communications that relate to client

---

[7] The letter submitted by C&G detailing its investigation includes no further discussion or analysis regarding these newly-discovered "inadvertent [technical] errors" by Kerr Russell. ECF No. 63-22.  Rather, C&G posits that H&H's February 2017 production was plagued not by one but three technical 'glitches'.

communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." (internal quotations omitted)). The Second Circuit requires that "a party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance thereof." In re Richard Roe, 68 F.3d at 40 (citing John Doe, Inc. v. United States, 13 F.3d 633, 637 (2d Cir. 1994)); see also In re Gen. Motors LLC, No. 14 MC 2543 (JMF), 2015 WL 7574460, at *4 (S.D.N.Y. Nov. 25, 2015) ("[T]o subject privileged communications or attorney work product to disclosure, a party must show a purposeful nexus . . . [and] that the communications were made with an intent to further the crime or fraud." (internal citations, quotations, and emphasis omitted)). The crime-fraud exception "applies to both the attorney-client privilege and the work product doctrine." In re Gen. Motors LLC, 2015 WL 7574460, at *3.

"Case law on the crime-fraud exception does not make perfectly clear what wrongdoing must be alleged, and with what specificity, in order for the [crime-fraud exception] to apply." Chevron Corp. v. Salazar, 275 F.R.D. 437, 452 (S.D.N.Y. 2011). "At a minimum, the attorney-client privilege does not protect communications in furtherance of an intentional tort that undermines the adversary system itself." Zimmerman, 2012 WL 2049493, at *17 (quoting Madanes v. Madanes, 199 F. R.D. 135, 148-49 (S.D.N.Y. 2001)).

Here, Abbott submits that H&H committed discovery fraud by intentionally withholding documents from its February 2017 production in Abbott I. "[O]rdinary (albeit perhaps overly aggressive)' discovery tactics, such as 'construing the concept of relevance too narrowly and thus withholding documents and materials that should have been turned over' are insufficient to trigger the crime-fraud exception[.]" ECF No. 81 at 2 (quoting In re Gen. Motors LLC, 2015 WL 7574460, at *9). However, courts have applied the crime-fraud exception where a party's actions in

10

discovery are found to be "calculated and purposeful litigation misconduct." In re Gen. Motors LLC, 2015 WL 7574460, at *9 (citing 1100 W. LLC v. Red Spot Paint & Varnish Co., No. 05 CV 1670 (LJM) (JMS) 2009 WL 232060, at *5 (S.D. Ind. Jan. 30, 2009) (finding that defendant "committed a fraud upon the Court" and "used its attorneys to do so."))  Abbott argues that H&H's conduct in this action is beyond the everyday discovery failures commonly seen in litigation, rather, "H&H has engaged in serious litigation malfeasance."[8] ECF No. 63 at 6.  The Court agrees.

The parties represent that they have labored to get to the bottom of the deficient February 2017 production.  Despite the efforts of five law firms, a Forensic Technology and Consulting firm's report, an internal investigation, and a civil seizure of H&H's records and communications, the record is replete with troubling and unanswered questions.  Although H&H sets forth a number of possible reasons for the February 2017 deficient production, H&H fails to proffer any sensible explanation for why no Holland Trading or Howard Goldman documents were included in the production.  Even swallowing H&H's version of the facts that there was a "technical glitch" and that the problem was the "poor lawyering" of Mr. Yert, H&H fails to account for how every document mentioning Holland Trading or Howard Goldman was conspicuously omitted from H&H's Court-ordered production.[9] See 1100 W. LLC, 2009 WL 232060, at *5 ("The discrepancy between [the Rule 30(b)(6) witness'] testimony about her document search and reality creates an unmistakable inference that [the client] knew it had something to hide and took steps to hide it.").

---

[8] Abbott argues that "ignoring the overwhelming evidence . . . would create a moral hazard and encourage H&H, and others like it, to engage in discovery fraud in the future. Our civil justice system depends on adversaries' good-faith compliance with discovery procedures and orders." ECF No. 63 at 6.

[9] Putting aside the selective absence of the Holland Trading and Howard Goldman documents, the Court also questions the small number of documents produced in H&H's original February 2017 production. Mr. Yert represented to the Court that there were "approximately 6,000 responsive documents" to be produced as part of the February 2017 production. Abbott I, ECF No. 1075. However, only 315 documents were produced to Abbott. ECF No. 63 at 2. This discrepancy is never explained by H&H: not by the Pochron Affidavit, see ECF No. 62-22 (noting that the Auditor account returned 1540 messages); not by the C&G investigation, ECF No. 62-23; not by H&H's Opposition, ECF No. 80; and not by the Court's review of the documents submitted for *in camera* review.

11

Based on the facts before the Court, "a prudent person [would have] have [a] reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud[]" by H&H. In re Grand Jury Subpoena Duces Tecum, 731 F. 2d 1032, 1039 (2d Cir. 1984).

The Court finds that Abbott has met its burden. Abbott has demonstrated that there is probable cause to believe that a fraud has been attempted or committed and that H&H's communications with counsel were in furtherance thereof. Here, H&H admits that Mr. Sweet and Mr. Yert worked together to review the production and that the production, and the legal decisions surrounding the production, were made by Mr. Yert. ECF No. 63-22. Accordingly, Mr. Yert's actions with regard to the production – his communications with Mr. Sweet, his proffers to the Court regarding the production, including the number of responsive documents, and his production disclosing only 315 documents to Abbott – were in furtherance of the fraud. The Court cannot countenance the use of attorneys as "'front men' in a scheme to subvert the judicial process itself." In re Sealed Case, 754 F.2d 395, 402 (D.C. Cir. 1985).

H&H's main argument is that there is no reason that H&H "would need or want to consult with legal counsel" about any scheme to withhold Holland Trading and/or Howard Goldman documents.[10] H&H's Opposition at 15-16 ("If H&H had deliberately sought to omit documents implicating them, why would it need to consult counsel? Indeed, what would Mr. Yert's counsel even add to such an exercise?"). Therefore, H&H argues that to be 'in furtherance' of the fraud, it must be shown that "H&H personnel consulted with Mr. Yert as legal counsel to assist in the supposed withholding of documents." Id. at 15. (emphasis added). H&H's argument misses the mark. Mr. Yert's knowledge of the fraud does not determine whether his actions were 'in

---

[10] H&H admits that if a party commits a fraud without their attorney's involvement, the attorney-client privilege would not apply. See February 27, 2018 Transcript, ECF No. 101 at 23:1-24:8 ("[I]f a party commits fraud [without their attorney] . . . [n]one of that is privileged.").

12

furtherance' of the fraud.  "The exception applies even if the attorney is unaware that his advice is sought in furtherance of a crime or fraud." Avramides v. First Nat. Bank of Maryland, No. 87 Civ. 5732 (WK), 1997 WL 68559, at *1 (S.D.N.Y. Feb. 19, 1997); see also Zimmerman, 2012 WL 2049493, at *22 ("There is no need to show that the lawyers intentionally assisted in these efforts or even were aware of defendants' objectives.").  It is enough to find that Mr. Yert, "whether [h]e realized it or not," was an instrumentality of the fraud. In re Sealed Case, 754 F.2d at 402 ("[T]he fact that [the attorneys'] primary role was the prosecution of legitimate lawsuits cannot whitewash [the client's] ancillary use of the attorneys to assist in its fraudulent scheme.").  Although there are still many unanswered questions, the factual basis of the alleged fraud is clear: H&H's February 2017 Court-ordered production was in furtherance of the fraud.

## CONCLUSION

Although the Court loathes to strip the privilege from attorney-client communications, the Court has the responsibility to uphold the integrity of our civil justice system.  H&H's deficient February 2017 production in this action goes quite beyond technically challenged or bumbling behavior.  That benign characterization of H&H's conduct is simply disingenuous.  The record reflects that H&H's deficient February 2017 production was calculated and purposeful.  Therefore, the crime-fraud exception applies.[11]

Nonetheless, upon review of the privileged communications produced for *in* camera review, the Court is not persuaded that the documents themselves satisfy the 'in furtherance' requirement.  Accordingly, H&H need not disclose the documents produced for *in camera* review.  The Court recognizes that, for obvious reasons, the pertinent communications 'in furtherance' of

---

[11] At oral argument, in response to the Court's query why there are not more crime-fraud exception cases in civil actions regarding discovery, Abbott's counsel astutely pointed out that there are not many cases where one side seizes the adversary's servers. Id. at 29:17-20 ("Because we don't usually get to seize the other side's email server and see the 90 percent of the documents that have been withheld.").

13

the fraud may not be committed to writing. See ECF No. 101 at 29:23-30:25 (Abbott acknowledged the strong likelihood that communication between H&H and counsel 'in furtherance' of the fraud "was not in writing. It's oral.")

Accordingly, Abbott may question witnesses at their depositions regarding H&H's February 2017 deficient production. H&H may not claim attorney-client privilege or work-product immunity with regard to communications concerning H&H's February 2017 document production in Abbott I. H&H and its counsel are prohibited from withholding testimony about such communications on the basis of attorney-client privilege or work-product immunity. The scope of the crime-fraud exception includes the February 2017 production and the re-production made pursuant to the Court's March 24, 2017 Order. The crime-fraud exception shall apply to all oral communications concerning the productions, including the planning, preparation, searching, identifying, collecting, reviewing, and delivering the documents and/or productions.

SO ORDERED.

/S/
LOIS BLOOM
United States Magistrate Judge

Dated: March 9, 2018
      Brooklyn, New York