1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

2
     -----------------------------x

3                                       17-CV-3095(CBA)(LB)
     ABBOTT LABORATORIES, et al.,

4                                       United States Courthouse
              Plaintiff,                Brooklyn, New York

5
              - versus -                June 27, 2018

6                                       12:00 p.m.
     H&H WHOLESALES SERVICES,

7    INC. et al.,

8             Defendants.

9    -----------------------------x

10        TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
                  BEFORE THE HONORABLE LOIS BLOOM

11              UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES

13
     Attorney for Plaintiff:   PATTERSON BELKNAP WEBB & TYLER LLP

14                             1133 Avenue of the Americas
                               New York, New York 10036-6710

15                             BY:  TIMOTHY ALAN WATERS, ESQ.

16
     Attorney for Defendant:   SPRINGUT LAW PC

17                             45 Rockefeller Center, 20th Floor
                               New York, New York 10111

18                             BY:  MILTON SPRINGUT, ESQ.
                                    TAL BENSCHAR, ESQ.

19

20   Court Reporter:           RIVKA TEICH CSR, RPR, RMR
                               Phone:  718-613-2268

21                             Email:  RivkaTeich@gmail.com

22   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

23

24

25

PROCEEDINGS

1          (In open court.)

2          THE COURTROOM DEPUTY:  Civil cause for telephone

3  conference, docket 17-CV-3095, Abbott Laboratories against H&H

4  Wholesale Services, et al.

5          Parties, please state your names for the record.

6          MR. WATERS:  Timothy Waters from Patterson Belknap

7  Webb & Tyler on behalf of the plaintiffs.

8          MR. SPRINGUT:  Milton Springut and Tal Benschar from

9  Springut Law on behalf of H&H defendant.

10         COURTROOM DEPUTY:  The Honorable Lois Bloom

11  presiding.

12         THE COURT:  Good morning, Mr. Waters, Mr. Benschar,

13  and Mr. Springut.  I hope everybody is well today.

14         This is a telephone status conference in plaintiff's

15  action against H&H Wholesale Services.  There have been letter

16  motions dated June 20, June 24 filed by H&H.  Abbott has

17  responded to the letters.  And we've also gotten a reply.  In

18  the future, I do not want replies to be filed unless you get

19  Court permission; it's just too much.

20         There were a number of disputes raised by H&H's

21  letter, and Mr. Benschar and Mr. Springut, I'll of course give

22  you the floor.  But I also want to say to you that having

23  reviewed all of the letters I could boil it down to a couple

24  of issues of what I think we should be taking about today.

25  But if you want to go through all of them, I'll give you some

PROCEEDINGS

1    time.

2        Let me just say that the two issues that I thought

3    were credible issues where maybe they've already been

4    resolved, H&H is requesting the agreements that have been

5    produced in the other case.  And I saw that Abbott has agreed

6    to give those -- to allow those agreements to be used for the

7    purpose of this action.  But I didn't see whether there was

8    any discussion about whether Abbott could turnover for the

9    dates involved in this case, the three agreements for the

10   companies that were turned over in the 2015 case.

11       Did that make sense to you, Mr. Springut and

12   Mr. Benschar?

13       MR. BENSCHAR:  Mr. Benschar here.  I'll just

14   identify my name for the record as we go along.

15       THE COURT:  That would be helpful.

16       MR. BENSCHAR:  My understanding is Abbott's position

17   is we can use what was produced in the last case but they

18   won't update the agreements for this case.  Our position is

19   you've ruled on this and they are discoverable.  The only

20   difference is Abbott admits in its letter the time scope is

21   different in this case.  In the prior case all the

22   infringements ended because Judge Amon, near the end of 2015 a

23   TRO, which became preliminary injunction, there was no

24   infringement after 2015.  You ordered '14 and '15 because

25   those were the years of infringement in this case.  The

PROCEEDINGS

1   infringement, everybody concedes, was 2016 to 2017.

2          So our position is very simply, you ruled on this.

3   Except there is a different temporal scope and they should be

4   updated.

5          I should note parenthetically, my experience, what I

6   review -- I don't know if it's the case here -- often what

7   happens is you have a contract, then every year there is an

8   addendum and we reincorporate the contract, here some other

9   small terms, maybe big terms.

10         The bottom line is, these contracts should be

11  updated.  Whatever was produced before we should have the

12  updated whatever it was in effect then '16 and '17.

13         THE COURT:  For the three companies that were

14  previously turned over, correct, Mr. Benschar?

15         MR. BENSCHAR:  Yes.  Whatever the Court ordered

16  before we will limit our request to that, other than the

17  temporal difference.

18         THE COURT:  And Mr. Benschar, if I could just make a

19  suggestion to you, you want a good record, we do have a court

20  reporter, slow down.

21         MR. BENSCHAR:  Okay.

22         THE COURT:  I was agreeing with you on that point.

23  That's the one, I have like maybe two points I agree with you

24  on, that's the one point that I do agree with you on.

25         So Mr. Waters, do you want to be heard on that

PROCEEDINGS

1    issue?

2              MR. WATERS:  If we can boil this down to a couple of

3    issues, your Honor.  Listen, the reason my client objects to

4    this is, you know the confidentiality issues discussed

5    extensively in case law.  These are -- the two or three that

6    were produced in case law were samples.  If there is something

7    there that was actually relevant to this case, the parties

8    would have a chance to review it.  And none of the defendants,

9    including H&H, have identified anything in there that's

10   relevant.

11             We also have confidentiality concerns specific to

12   H&H, vis-a-vis the sanctions issued in the last case.  I don't

13   want to go back over it on this cause.  The substantive

14   objection here is they have the samples, they proved nothing.

15   If there was fire under all that smoke, it could have been

16   presented by now.  Since there is nothing there, I don't see

17   the reason to continue down this path of discovery.

18             THE COURT:  I do understand your point.  You say

19   that the PBM contracts were not used in the diversion action

20   when there was depositions, experts, that it wasn't used at

21   all.  But I do take the one point H&H is saying, is that this

22   is a different case.  I take your point too, Mr. Waters, that

23   H&H was represented by different counsel in the diversion

24   action and that they should not be allowed to reopen discovery

25   because they have new counsel for that case.

PROCEEDINGS

1        But on this one point about the PBM contracts for

2   2016, I don't know what portion of 2017 would be relevant

3   because I think, again, that's something that we have to speak

4   about.  The case here was filed in May of 2017 so I don't know

5   if they would be entitled to 2016 and 2017 contracts.  But I

6   don't know when these PBM contracts are renegotiated.

7        Mr. Waters, do you have any information on that?

8        MR. WATERS:  I don't.  But if your Honor is going to

9   make the ruling -- we've updated everything else.  The PBM

10  contracts we thought was a sample so we thought it was a

11  different category.  If your Honor is going to order us to

12  update those, we'll find out when any new contracts, new

13  amendments whenever occurred.

14       I think the parties agree when the counterfeiting

15  stopped.  And so anything that was entered into as of or

16  before that date the counterfeiting stopped, if you order us

17  to produce them, we with agree to produce up to that date.

18       THE COURT:  Very good.

19       MR. BENSCHAR:  Just to clarify, that date is May 25,

20  2017, which is when they effected a seizure.  And yes, so,

21  that's the date, the cut off date.  So obviously it was

22  negotiated after that.  I don't know either when they are

23  negotiated, but it should cover that period up to that date.

24       THE COURT:  That's fine.  So I am going to direct

25  that Abbott provide the PBM contracts for the years 2016 and

PROCEEDINGS

1   2017.  The cut off date will be the 5/25/2017 date.  And I

2   note that this action was filed on 5/23/2017.

3           Okay, so the other issue that I was willing to talk

4   about with you, Mr. Springut and Mr. Benschar, is the

5   privilege log.  And who is listed and what you need to

6   evaluate the entries on the privilege log.  So if you want to

7   be heard on that issue, I will hear from you.

8           MR. BENSCHAR:  Yes, your Honor.  Basically their

9   privilege log, which we provided to you, listed numerous

10  entries and many of them, not all, have large number of people

11  that are copied on things.  We have no idea who they are, why

12  they are getting this privileged information.  And we need to

13  evaluate their claim of privilege.  Why are all these emails

14  being sprayed to sometimes 15 to 20 people in the Abbott

15  company.

16          As we cited in our brief, when it comes to

17  corporation, you have to keep privileged communications with

18  those with a need to know.  That's the legal test and we have

19  no way of evaluating that.

20          Putting aside our interrogatory, the federal rules

21  make clear you have to put in your privilege log enough to

22  evaluate what is going on.

23          It's one thing if you have an e-mail from counsel to

24  the head of counterfeiting in Abbott and nobody else is

25  copied, that's simple and obvious.  But here you have numerous

PROCEEDINGS

1  people, no clue who they are, why are they getting this.  I

2  think Abbott has to provide enough information for us to

3  evaluate what it is.

4          THE COURT:  Mr. Waters?

5          MR. WATERS:  I don't have much to say about what I

6  said in the letter.  I think they overstate the law a little

7  bit.  If we want to talk about entries on the privilege log,

8  I'd like to talk about entries on the privilege log.  I'd like

9  to get way beyond the 70-plus names representing everyone on

10  the log.  No one identified the issues -- the entries, where

11  there is a real potential dispute.  Talk about what you

12  actually need, as opposed to everything that is requested in

13  that interrogatory.

14          Like I said, we may -- I'm honestly not forecasting

15  this, I don't know what document is in dispute.  We just

16  produced it.  We don't really care about this as long as

17  you're not going to argue anything else, we'll give you the

18  document.  We're all about practical comprises when it comes

19  to privilege log.  I can't without objection impose on my

20  client the cost of going through entire list of names that's

21  not been whittled down at all and give detailed information

22  about their job responsibilities, things like that.

23          I want to narrow this dispute and take practical

24  steps to resolve this before re-presenting this to the Court.

25          THE COURT:  Mr. Benschar?

PROCEEDINGS

1          MR. BENSCHAR:  Your Honor, what Mr. Waters suggests

2   is a lot of work for nothing.  To go -- you have the privilege

3   log before you, hundreds of entries there.  He mentioned

4   70-some names of Abbott.  I didn't include investigators so

5   on.  It's far more efficient -- I don't understand this at

6   all.

7          We're talking about, just this is the person, here

8   is the title or she what they do, where they work.  That's a

9   short -- we're talking about a few sentences for each of these

10  people.  Why is that hard?  He doesn't have to give me their

11  whole CV.

12          THE COURT:  I'm so sorry.  I'm looking at your

13  interrogatory, number eight, you would like not only for

14  Abbott to identify the 76 individuals and describe their

15  function at Abbott, but as to each of the following

16  individuals identified in the privilege log, identify their

17  title, corporate entity which employees the person, the name

18  of the division/department for which the person works, the

19  person's duties and responsibilities, the address where the

20  person fulfills his or her employment duties.  So that you're

21  telling me it's too much work for to you go through the

22  privilege log to tell Mr. Waters what it is that you actually

23  need that's listed here, what communications are we even

24  looking at?  Because I do see a number of these communications

25  are between Mr. Potter and somebody at the plaintiff's

PROCEEDINGS

1    corporation.

2          So, I'm sorry, when you're talking about it's too

3    burdensome for you, Mr. Benschar, to go through the privilege

4    log, that's your job.  You're turning this on its head by

5    saying it's too burdensome for you to go through the privilege

6    log to have a conversation with Mr. Waters about which of

7    these you're really interested in, because they may just

8    turnover those documents instead of supplying all the

9    information from your interrogatory.

10          MR. BENSCHAR:  The answer to that is, first of all,

11    some of these, many of these people, are in multiple entries.

12    And the answer to that is it's their burden to justify that

13    it's privileged.  Just to say I sent it to John Doe somewhere

14    in Abbott, which is all over the world, doesn't meet their

15    burden.

16          THE COURT:  Again, let's be clear they haven't just

17    said they've sent it to John Doe.  They've given you a

18    detailed privilege log, that I am looking at as we're

19    speaking, it's Exhibit 6.  It does list quite a lot in the

20    privilege log.  I understand that you're not happy with all of

21    these documents being included in the privilege log, but I'm

22    trying to come up with a reasonable way to resolve this

23    dispute.  And you saying that they should just turnover

24    everything that you've asked for is not a reasonable way to

25    resolve the dispute.

PROCEEDINGS

1          So would you like to take another shot at all,

2    Mr. Benschar, to see how we could resolve this?

3          MR. SPRINGUT:  With regard to any, with regard to

4    the outside lawyers, with regard to anyone who has been

5    deposed or put in a declaration in the case, we don't need

6    Abbott to do that.  But we have no idea who else these people

7    are.  And the descriptions are inadequate to figure out

8    exactly what these documents are; they are typical lawyer

9    descriptions that don't address what is in the document.

10          THE COURT:  I guess, Mr. Springut, that my

11   suggestion is, and I don't care if it's a random sample or you

12   just take five pages of it, I would think that if you look at

13   the list and you're telling them these are the people that you

14   need to know who they are because you don't know who these

15   people are, you could in short order figure out whether this

16   is worth the fight.  And that's -- go ahead.

17          MR. SPRINGUT:  I thought I just did that, outside of

18   the people who have been deposed or put declarations in, or

19   outside counsel, we don't know who any of these people are.

20   And as your Honor knows, if there even one person who gets the

21   communication without a need to know, that breaks the

22   privilege.

23          THE COURT:  But first you've asked for 75 different

24   people.  And you've asked for, as I read into the record, all

25   of that information.  So it wasn't just, who were the people

PROCEEDINGS

1  and what is their title, that's not what you asked for.

2          Mr. Waters, would you like to respond?

3          MR. WATERS:  I don't know how much more I have to

4  say, your Honor, other than the list has to be whittled.  And

5  if they are telling me that they have a problem with an e-mail

6  from counsel to one person, an e-mail sent during the course

7  of these litigations, as all of them were because the

8  counterfeiting occurred during the course of litigation, they

9  need to say, I need to know that person's responsibility

10  because I haven't seen that name before, that goes beyond what

11  I thought they were asking.

12          I thought they were asking about the long e-mail

13  chains, frankly the same names, frankly the same e-mail chain

14  being responded to with a bunch of people and they don't know

15  about those names.  You want to talk about those to start

16  with?  We can talk about those people there, then at least

17  were not talking about all the names on the logs.

18          You can get a chance of a best shot of making this

19  argument what the people's roles are.  I'm asking them to

20  waive any further objections, a limited starting point rather

21  than insisting on basically everything.

22          THE COURT:  Mr. Benschar?

23          MR. BENSCHAR:  Yes, your Honor.  I'm not sure what

24  everything means.

25          Let me give you an example.  The first page, entry

PROCEEDINGS

1  six, here we have something from Judy Chavez, who is not

2  outside counsel.  I don't know if she's inside counsel.  You

3  have a list on one side, it runs off the page in fact, of

4  numerous people, then you have CC's even more people.  I'm

5  told this is some kind confidential communication concerning

6  investigation of traveling of counterfeit boxes of Freestyle.

7  I have no clue why are all these people copied on this.  What

8  was going on over here?  We have here from a rough estimate,

9  as I said, the names run off the page.

10         THE COURT:  So what I'm suggesting, Mr. Benschar, is

11  exactly what you're doing but without me on the phone.  I'm

12  suggesting that you have this conversation with Mr. Waters.

13  And they may be electing just to give you that document

14  instead of fighting about it, or giving you the names and all

15  the other information you've requested regarding everybody

16  that was e-mailed to on the chain or CC'd to.  I don't know if

17  that will be the result.  But I'm direct you to make that

18  effort.

19         MR. BENSCHAR:  Okay.  The effort consists of

20  identifying these e-mails.

21         THE COURT:  The effort consists of you having a

22  nice, long chat with Mr. Waters, preferably not on the day

23  before a holiday weekend, where you both can devote some time

24  to going through the privilege log.  Because right now, the

25  way you've presented it to me, I'm not going to the grant you

PROCEEDINGS

1   the information that you're seeking.  But I'm not wholly

2   discounting that there may be things on the privilege log that

3   you're entitled to, or that Abbott would be willing to produce

4   whether or not you're entitled to it.

5            But giving me the job of figuring out who all these

6   people are on an e-mail chain, or whether or not that defeats

7   the privilege, I'm just not going to do that.  You haven't met

8   your obligation to meet and confer.  Mr. Waters said he would

9   be willing to talk to you and perhaps they would turnover

10  documents instead of fighting with you about the privilege.

11  And I'm directing that you should have those conversations

12  before you bring this matter back to my attention.

13           MR. WATERS:  For me to know whether we will consider

14  just turning over a document or producing it for opposing

15  counsel's review, I need to know in advance what those

16  documents are.  I would ask that you provide me with a list

17  that you think is reasonable as a starting place of

18  communications on the privilege log so we both know what we'll

19  be discussing going in I can review those documents

20  beforehand.

21           THE COURT:  Can I make a suggestion, Mr. Springut,

22  Mr. Benschar and Mr. Waters, there are so many documents

23  listed here why don't we do a sampling where Mr. Benschar and

24  Mr. Springut you give, Mr. Waters, 20, they are all numbered

25  on the log, and give Mr. Waters a couple of days to look over

PROCEEDINGS

1    those 20 that you've identified that won't be waiving your

2    rights to think that they have listed documents that are not

3    privileged, I'm just saying we'll do a sampling.  You'll get

4    to meet and confer.  And if you're not able to resolve this,

5    you can bring it back to my attention.  But then I'll have

6    specific information instead of having a log with a

7    generalized claim that you should be given everybody's name,

8    rank, serial number, responsibilities, et cetera.

9            How long do you want to do this?  A couple of weeks?

10           MR. BENSCHAR:  Yes, your Honor.  We have summary

11   judgment motion due July 10 I believe.

12           THE COURT:  The summary judgment motion is on a

13   different matter and that is not what my concern is.  Let's be

14   very clear.  Discovery in this case is ending in August.  That

15   you have a summary judgment motion on withdrawing the

16   stipulation or the cross motion for sanctions, that's not my

17   deadline.  And that you've painted yourself into a corner on

18   that, that's your business.  That's not how I'm going to

19   conduct a discovery dispute.

20           I think it's reasonable to give you several weeks to

21   try to resolve that one issue, the privilege log, and so I

22   would say that you should have met and conferred by July 16.

23   And if you're unable to resolve it, you should notify me and

24   I'll put it back on my calendar for a conference.

25           So Mr. Springut and Mr. Benschar, the one last point

PROCEEDINGS

1    that I thought perhaps we could get a stipulation to obviate

2    the need for, is in the expert report, Mr. Waters, they say

3    that your expert, Dr. Bell, took an average.  And instead of

4    the average they want to know what the highest cost was for

5    the rebates paid to PBMs and -- go ahead, Mr. Waters.

6            MR. WATERS:  To correct the record, the average cost

7    has to do with a separate thing.  This is an inventory

8    management fee paid to the distributors for the work with

9    dealing with the product.  And if your Honor is subjecting we

10   stipulate to what the range is there, if that will resolve the

11   dispute, I'm happy to do so.

12           THE COURT:  I thought you could give them the

13   highest cost.  I didn't think you needed to give them the

14   range, that's fine.  Then we'll have the highest cost and the

15   lowest cost.  Thank you for the clarification.  You know all

16   of your acronyms are driving me a little crazy.  But it's the

17   inventory management, yes, it was not the rebates to the PBMs.

18   Thank you.

19           Mr. Benschar and Mr. Springut, that was my

20   suggestion on how to resolve that issue.

21           MR. BENSCHAR:  I'm not sure what issue that is

22   referring to.  We are still asking for the agreements with the

23   distributors as well as the other documents about payments.

24   So I'm not sure --

25           THE COURT:  Why do you need the agreements if you're

PROCEEDINGS

1    getting them to stipulate to the inventory management fee?

2    Why would you need the agreements?

3                MR. SPRINGUT:  Because the agreements will also

4    reference other payments, rebates, credits that those

5    distributors are getting, which go way beyond inventory

6    management fees.

7                So if, your Honor, I don't want to preclude you from

8    going down this road, but to me document request 91, 92, and

9    82 are really more or less the same universe.  I don't want to

10   stop you from this issue, but it's a much bigger issue than

11   just inventory management fees.

12               THE COURT:  I read all of your papers.  I have to

13   say, you have not persuaded me that you need any of that

14   information.  Again --

15               MR. BENSCHAR:  Let me try again, your Honor.

16               THE COURT:  I'll give you a short period of time to

17   do that.

18               Let me also say, even though you quoted from H&H's

19   request number 92, I don't think in the hundreds of pages that

20   you submitted to us that you gave us the full requests.  So I

21   do have responses to some, but not to all.  And I will tell

22   you that again, what you've already given me does not persuade

23   me that you're entitled to more, other than to hear what the

24   inventory management fee, I thought that there could be a

25   stipulation to the highest inventory management fee, because

Rivka Teich CSR, RPR, RMR, FCRR
Official Court Reporter

PROCEEDINGS

1    you were disputing the average used by Bell and you wanted the

2    underlying documents so that you could, I guess, certify that

3    Bell had done his analysis correctly.  And I thought a

4    stipulation would serve the same purpose.  And that would

5    obviate the need for the production of the documents.  So you

6    want one more shot at me, go ahead, Mr. Benschar.

7             MR. SPRINGUT:  So let's put this into perspective,

8    what this is all about.

9             This is basically Abbott has put into play its

10   damages by seeking that as its monetary recovery.  And in

11   support of that, it filed the declaration, the report of

12   Dr. Bell.  What Dr. Bell says, I'm quoting from page eight of

13   his report, he says, "My conservative measure of Abbott's

14   alleged economic loss is equivalent to the difference in the

15   wholesale price obtained by Abbott for U.S. sales (net of

16   appropriate discounts) and the wholesale price obtained by

17   Abbott in the country."

18            So his formula for coming up with a number that is

19   in excess of a million dollars in this case, is what are the

20   revenues of Abbott in the U.S.  And then you take the

21   difference of that with the wholesale price obtained by Abbott

22   in the country of where we supposedly bought this.

23            So our document request number 91 askings for a

24   persons part, documents to show the revenue received for such

25   sales.

19

PROCEEDINGS

1        THE COURT:  I have documents sufficient to show the

2    volume of Freestyle test strips sold by Abbott in the United

3    States; B, the revenue received for such sales; and C, the net

4    profit earned on such sales.

5        Are we looking at the same request?

6        MR. SPRINGUT:  We are.  But A is not in play here;

7    just B, the part that I read.

8        THE COURT:  Very good.

9        MR. SPRINGUT:  Again, we're looking for documents to

10   show the revenue received, Freestyle test strips, that's what

11   this is about.  Okay.

12       THE COURT:  Okay.

13       MR. SPRINGUT:  Abbott in its response, Abbott has

14   already produced documents sufficient to show, dot, dot, dot,

15   the revenue Abbott received for such sales.  That is not

16   correct.

17       What Abbott did is provided documents to show what

18   the list price was for the Freestyle strips, along with two

19   items that it was willing to discount from that number, that

20   is not the real price.  We're looking for the real revenues

21   here.

22       We say they are additional rebates, credits,

23   whatever you want to call them, that Abbott provides to its

24   distributor customers.  That's what we're seeking.  That has

25   never been sought before and that's what we're seeking here.

PROCEEDINGS

1        And no where in here do I find that Abbott has said

2   they don't have any such documents.  It's very interesting

3   word play going on.  If it you look at Abbott's --

4        THE COURT:  Can I just instead of looking at

5   Abbott's, can I ask Mr. Waters to respond to what you are

6   saying you're looking for?

7        MR. WATERS:  Your Honor, there has been -- I've

8   obviously investigated this issue with my client.  And in the

9   diversion action deposition, they asked for the identity of

10  the people most knowledgeable about these costs, rebates,

11  whatever you want to call them.  Deposed that person.  Two

12  witnesses on that.

13       By the way these witnesses were deposed in September

14  after the counterfeiting action had been filed.  They said

15  what exists.  They testimony was internally consistent.

16  Consistent from what I heard during my own investigation with

17  the client.

18       So the answer I have to give, and we have

19  consistently been giving are, there are the 2 percent prompt

20  payment discounts.  We have taken that issue completely off

21  the table by crediting 2 percent discount on every single

22  order that is in our damages analysis, so we don't have to go

23  through the crazy process of straightening out how often the

24  2 percent was taken.  We're --

25       THE COURT:  Slow down, Mr. Waters, please.

PROCEEDINGS

1    MR. WATERS:  I apologize.  I need the same reminder

2    as Mr. Benschar.

3    We've taken the 2 percent discount off the board.

4    The inventory management fees, we thought that the average was

5    sufficient.  They want to challenge it.  They want to apply

6    the highest percentage, fine.  We're talking about like a half

7    a percent of the damages any way, $20,000 off of this case.

8    We spend more money arguing about this.  To have the actual

9    inventory management fees paid and they can get the highest

10   percent of contracts.

11   There is nothing else.  They keep saying there is

12   more, there is more, there is more.  We keep saying, tell us

13   why you think that?  Tell us why you're accusing our witnesses

14   of lying under oath.  We get nothing.

15   There is no reason to revisit this issue.

16   THE COURT:  So Mr. Benschar and Mr. String, I agree

17   that this a different action than the diversion action.  So I

18   get your point that you shouldn't be held to only have done

19   the discovery from the diversion action would not give you the

20   full and fair opportunity to do discovery in this action.  But

21   I also see Mr. Waters' point that they've already testified

22   under oath that there are only two items, and that there are

23   no additional credits or rebates that are factored in.

24   So what is it that I'm missing?  Because

25   Mr. Springut, you did not convince me that there is something

PROCEEDINGS

1   else.  And I do credit that there has been testimony under

2   oath, albeit in a separate action, that there are only

3   inventory management fees and this 2 percent prompt payment

4   discount, and there are no other additional credits or

5   rebates.  So what else am I supposed to do?

6           MR. SPRINGUT:  So that's exactly the point, your

7   Honor.  There is no such testimony that Mr. Waters testified.

8   If there is such testimony, let him identify it.  What he

9   identified in his letter does not say that.  There is no such

10  testimony that there are no other payments, rebates, credits

11  or whatever you want to call them.  That's the issue here

12  okay.

13          You know how I know that, because if in fact that

14  were the case, in response to document request 92, it would be

15  very easy for Abbott to say we have no such documents.  There

16  is no such representation there.

17          THE COURT:  Mr. Waters?

18          MR. WATERS:  I'll say it on the record.  I've

19  investigated this issue with my clients.  I've reviewed the

20  testimony.  There are no other such categories.  There are no

21  such other documents.

22          MR. SPRINGUT:  Where is your testimony in the

23  record, Mr. Waters, that you could identify?

24          THE COURT:  He's supposed to have that at the tip of

25  his mind right, now page number?  Come on.

PROCEEDINGS

1          MR. SPRINGUT:  This should have been in the letter

2   response.  We have that assertion in the letter response

3   without any -- it's a lot of hand-waiving and we don't have

4   any record testimony to that effect.  And if in fact there are

5   no such documents, why is it so difficult for Abbott to say,

6   there are no documents.  As to come up with all this flexion

7   about these other credits, then say testimony in the other

8   case took care of it.

9          THE COURT:  Well, I thought that what Mr. Waters

10  just put on the record was exactly what you just asked for.

11  Of course, you're saying it could have been in writing, but I

12  think that Mr. Waters said is he investigated this with his

13  client, there are no other documents.  These are the only two

14  items that are at play here, the prompt payment discount and

15  the inventory management fee.

16         Mr. Waters, are you making that statement under oath

17  to the Court as an officer of the Court?

18         MR. WATERS:  As an officer of the Court, I spoke to

19  my client.  I reviewed the testimony.  My firm understanding

20  from that review and from speaking to my client, is that, yes,

21  those are the two applicable to Freestyle discounts, credits,

22  et cetera, paid to Abbott distributors of U.S. retail

23  Freestyle.

24         THE COURT:  And there is no other type of payment

25  credit or rebate?

PROCEEDINGS

1          MR. WATERS:  That is my understanding, that is

2    correct.

3          MR. SPRINGUT:  At a minimum, your Honor, given this

4    we want to test this.

5          THE COURT:  How?

6          MR. SPRINGUT:  By deposing Abbott.  By deposing a

7    person who will know.

8          THE COURT:  I thought that you --

9          MR. SPRINGUT:  This makes no sense, your Honor.  You

10   have -- Abbott has about 30 customers from their very biggest

11   to small distributors.  And to suggests that they all pay the

12   same list price for the same thing, is not reasonable to

13   believe.

14         THE COURT:  I don't know that's what Mr. Waters just

15   said.  He just said there are only two items that are -- he

16   didn't say there is one list price for everybody that Abbott

17   distributes to.  He just said that --

18         MR. SPRINGUT:  I believe he said that, your Honor,

19   because that's the so-called documentation that they produced.

20   They produced $72.58 cost that he's suggesting, very clearly,

21   that every one of the distributors paid.

22         THE COURT:  I thought you already deposed somebody

23   from Abbott?

24         MR. WATERS:  We had a specific request, I quoted it

25   in our letter, for the person most knowledgeable about the

PROCEEDINGS

1  fees, I think it was rebates, paid to the distributors.  We

2  put that person up.  They were deposed.  We put them up in

3  response to an interrogatory on this issue.

4          MR. SPRINGUT:  They were not asked about this issue.

5          THE COURT:  Who's fault is that?

6          MR. SPRINGUT:  Meanwhile --

7          THE COURT:  Wait, wait, wait.  Don't go off on

8  another tangent.  You got a chance to depose a witness who was

9  proffered by Abbott on this point, and you're saying they

10 weren't asked about this question?

11         MR. SPRINGUT:  They were asked about the specific,

12 the specific things, that Abbott identified.  They were not

13 asking about anything else.

14         THE COURT:  Why?

15         MR. SPRINGUT:  It's an interesting issue in case

16 one.  But that certainly doesn't preclude me from doing this

17 in case two.

18         THE COURT:  I'm asking, you still have until August

19 to complete discovery.  I'm not inclined to give you anymore

20 documents because I am persuaded there are no additional

21 documents.  You want to depose somebody?  Has that been

22 something that the parties have discussed?

23         MR. WATERS:  We haven't heard anything from H&H

24 whatsoever on depositions.

25         THE COURT:  There we go.  Mr. Benschar,

PROCEEDINGS

1    Mr. Springut?

2              MR. BENSCHAR:  There is also -- first of all, in

3    terms of the request Exhibit 2, that's exactly Abbott's

4    responses.  Request 82, which is in play, which is the

5    agreement between plaintiffs and their distributors --

6              THE COURT:  And I've already told you that you're

7    only going get the three PBMs.  Your distributors -- I'm not

8    persuaded that you need anything because, again, if they are

9    saying that there is only a 2 percent prompt payment discount

10   and an inventory management fee, no other rebates or credits,

11   they are willing to give you the high rate or the range of the

12   inventory management fee, I don't see why you would need any

13   other documents.

14             MR. BENSCHAR:  Because I'm being sued here for over

15   a million dollars in damages.  To the extent that I can find

16   credit to the revenue that Abbott received, I'm entitled to do

17   that and bring that out to the Court.  If you preclude me from

18   doing that, okay, I understand.

19             THE COURT:  No, wait.  First of all, don't take this

20   wrong, but you are not being sued, your client is being sued.

21             Second of all I'm not precluding you from finding

22   information.  I believe you've been provided with the

23   information, but you believe there is other information that

24   is being held by the plaintiff, and I keep asking what leads

25   you to believe that there is other information, and you're not

PROCEEDINGS

1    telling me why you believe there is other information.  You

2    just keep insisting that there has got to be something besides

3    this inventory management fee and this 2 percent prompt

4    payment discount.  And you're not telling me why I should

5    order them to produce things that I don't believe have any

6    bearing on the case or exist.

7              I've gotten a statement on the record today from

8    Mr. Waters that he has made the request from his clients, and

9    as an officer of the Court, he has been told that the only two

10   items are the property payment discount and the inventory

11   management fee.

12             I'm not interested in beating my head against a

13   brick wall.  What is it, Mr. Springut and Mr. Benschar, that

14   you want to do?  You want to depose somebody?  You can depose

15   somebody.  You have until August to depose somebody.

16             MR. SPRINGUT:  So what I told you before is that

17   everybody pays the same list price, every one of their

18   distributors from the largest to the smallest.  And the way

19   that's resolved is credits on the back end.  So therefore, one

20   of the things we want is we want the agreements to see what

21   else is in there.  So, okay, so you don't want to give us all

22   of them, let's take three that we pick.

23             THE COURT:  I'm not dong it.  I'm not doing it.

24   That's not going to be how we're going to proceed here.  I

25   understand that you say there are credits on the back end.

PROCEEDINGS

1    They've told me that there is only two items, the prompt

2    payment discount and the inventory management fee.  They've

3    said there is a sliding scale on the inventory management fee.

4    I've told them to put in a stipulation so you get the range.

5    I'm not telling them to give you their distribution

6    agreements.  There is no reason for it.

7         MR. SPRINGUT:  The reason for it is for the

8    defendant to be able to test this representation.  That's how

9    discovery works.  If I can't see the discovery then I can't

10   test this representation.

11        MR. BENSCHAR:  The problem is, Mr. Waters I'm sure

12   is being honest with the Court, but we have, it's just like

13   double hearsay.  He had a discussion with his client, we don't

14   know what it was.  And now he's telling the Court something.

15   And I don't know -- he says there are no deductions, maybe

16   they call it a rebate, maybe they call it a Christmas present,

17   who knows what they call it.  But the simple way of testing

18   the reality is, what is your connection, what is your

19   agreement with your distributors.

20        THE COURT:  Again, I've already said and I'm not

21   going to change my position, gentlemen, that you have the

22   opportunity to do a 30(B)(6) deposition to ask somebody under

23   oath whether there are any other hidden payments that you keep

24   alleging, hidden payments.  And it could be somebody who

25   negotiates these distribution agreements.  I don't care who it

PROCEEDINGS

1   is that you depose.  But I'm not going to tell them that they

2   have to turnover to you all of their distribution agreements,

3   or even a sample of them, when they are saying that the two

4   items that come out of the list price are the prompt payment

5   discount and the inventory management fee.  If you believe

6   there are hidden payments, I'll let you ask a witness every

7   which way you want.  You can depose anybody that has

8   information about the distribution agreements.  You can word

9   your 30(B)(6) notice however you believe will get at this

10  issue.  And if somebody says that there is something other

11  than the prompt payment discount and the inventory management

12  fees, I will be happy to reopen this conversation.

13          MR. SPRINGUT:  So I just want to understand that.

14  Just because someone says it's not so, that means I don't get

15  discovery on something that should be reasonably clear if in

16  fact it answers a question?

17          THE COURT:  Mr. Springut, I take my job seriously.

18  I understand you take your job seriously.  I do not see it

19  your way, sir.

20          I see that you are asking for things that are beyond

21  what you need.  I understand you don't trust Abbott and that

22  you're trying to defend your client, but getting the

23  agreements between Abbott and its distributors are not

24  something that I am going to direct Abbott at this juncture to

25  turnover.  So move on, sir.

PROCEEDINGS

1          So I have as one of my last items, unless the

2     parties want to discuss other matters, you want them to

3     turnover the videos and whatever else they have regarding the

4     seizure.  And they make the point that you're not asking about

5     statements Abbott made in its application for the seizure

6     order, but you're asking for things about the actual seizure

7     itself what was done during the seizure.  And I frankly don't

8     understand why that's relevant.

9          And two, in this day and age where everybody has a

10    cellphone, H&H was there when the seizure happened.  They

11    could have pulled out a cellphone and taken their own video of

12    this.  Why should I make Abbott turnover the video from the

13    seizure?  Why is that something that Judge Amon on would need

14    for her analysis of whether or not this stipulation that you

15    entered into, your client entered into, is a valid

16    stipulation?  That's my question for you, what does this have

17    to do with your case defending H&H?

18         If you were looking for discovery about statements

19    that Abbott made in its application for the seizure order, I

20    understand that.  But you're asking for discovery about the

21    seizure itself.  Mr. Benschar, Mr. Springut?

22         MR. BENSCHAR:  Let me mention a couple of things.

23    First of all, we're actually asking for two things, one is the

24    video.  The other are communications showing that they sent

25    samples, that they were ordered to do, to Ireland for

PROCEEDINGS

1   analysis, and report back about what is counterfeit and what

2   is authentic.  So that's what we're asking for.

3          Two, the motion you just mentioned about the

4   stipulation is not being brought.  So that's not even on the

5   table.

6          What is on the table is that, as you well know,

7   Abbott is filing, they told us, in fact they even wrote Judge

8   Amon a letter today, a motion for sanctions.  They are saying,

9   you committed all kinds of discovery problems, we want to

10  terminate and have a default judgment against you because you

11  did something wrong with the document production, you made

12  some other misrepresentation.

13         Now, we are entitled to defend that, among other

14  things, to show Abbott has also done things improper.

15         Let me tell you one of the big improper things here.

16  Abbott brought a counterfeiting action.  They have an exparte

17  order allowing the seized counterfeits, and Judge Amon very

18  clearly stated, they have to take samples, send them to

19  Ireland, and whatever is not counterfeit and not expired has

20  to be returned to H&H.  Now what happened was, and we've been

21  told, if they have a seizure -- by the way, the seizure

22  contrary what they thought, they told the Court, virtually

23  everything they seized was authentic.  They seized a dozen

24  boxes that were counterfeit.  Everything that they seized,

25  5000-plus authentic items, which Mr. Potter on the record, I

PROCEEDINGS

1   submitted to you, said were authentic.

2           The problem is, what happened is they sat on that

3   for over four months.  The reason, as Mr. Waters says in his

4   letter, they don't like, what they call counter-sell product.

5   One, I don't think there is any basis for that.  More

6   importantly, they are authentic.  As a matter of law there is

7   nothing wrong with selling them, not under the Lanham Act, not

8   under the judge's order, nothing.

9           What we have here is Abbott used a counterfeiting

10  action, and there may be a basis for the claim, to seize

11  5,000-plus authentic items and hold them for four months,

12  notwithstanding the express order of Judge Amon, you're to

13  test them and return them.

14          Now what have we been produced is -- and this is

15  bizarre in my mind -- Abbott produces three reports for the

16  counterfeit items, which are three items, three pairs of

17  items, two each, detailing this is all of the reasons these

18  three samples or these pairs of samples of counterfeit.

19          THE COURT:  I'm following you, but can we step back

20  for a moment.  I get you on the communications and the reports

21  to Ireland.  What does any of that have to do with the video,

22  though?

23          Let's just dispense with one of the two things you

24  asked for.  What does anything that you've just told me, that

25  they brought an improper counterfeit action, everything seized

PROCEEDINGS

1   was authentic, that they prevented you from getting those

2   items back to sell, what does that have to do with the video,

3   sir?

4          MR. BENSCHAR:  Well, the video is something done of

5   a, basically, a raid of our client's facilities.

6          THE COURT:  That was authorized by Judge Amon.  So

7   again, what does the video have to do with any of these claims

8   that -- I guess what you're trying to say is even though

9   Abbott is coming after you and saying that your client handled

10  so many things improperly and as a sanction their whole

11  defense should be stricken.  And you're trying to go back and

12  say Abbott is not so great either, is that the bottom line

13  here?

14         MR. BENSCHAR:  Right.  The video shows the conduct

15  of the seizure and how they did it.  And things they did that

16  may be beyond the scope of what they --

17         THE COURT:  Please, please stay with me,

18  Mr. Benschar.  Your clients were there.  What is it that you

19  are specifically saying was done during the seizure so the

20  Court should compel Abbott to turnover the video?  What is it

21  that your client was saying was done that you're trying to

22  point out to me?

23         MR. BENSCHAR:  Your Honor, I'm not going to know

24  that until I see the video.

25         THE COURT:  Your clients were there; that is not

PROCEEDINGS

1   going to work for me.

2          MR. BENSCHAR:  The secretary was there, most of the

3   people involved were not there.

4          MR. WATERS:  Mr. Yert shows up an hour in.  And the

5   seizure went on until the early morning the next day, like

6   3:00 a.m.  Mr. Yert assigned an H&H employee, we consented to

7   this, to follow around our investigators with his camera phone

8   taking pictures of anything that was being cataloged again

9   seized.  So the client was there.

10          The larger point, your Honor, is if they have got a

11   reason to accuse us of wrongdoing, let them say it.  I just

12   want to hope there is something out there.  It's a classic

13   fishing expedition, in addition to being kind of insulting,

14   and it should not be allowed.

15          THE COURT:  Mr. Benschar, let's not hear about the

16   video anymore.  I'm not going to order them to produce the

17   video.  If it's not true that there was an employee there, I'm

18   taking -- Mr. Waters was there, you weren't there.

19          My whole problem with your application was H&H was

20   there.  They could tell you what they think was wrong.  And

21   now I hear somebody was following around, not just Mr. Yert,

22   the first attorney on the case for H&H, but there was an

23   employee with a cellphone.  Talk to your employees.

24          So move on.  I'm not going to hear about the video,

25   that's off the table.

PROCEEDINGS

1          As far as the communications to Ireland, I get the

2     gist of what you're saying.  If they are turning over the

3     reports regarding things that were counterfeit, why aren't

4     they turning over the reports about the things that were

5     authentic.  So, Mr. Waters?

6          MR. BENSCHAR:  I want to heard on another point.

7     Mr. Waters quotes me in a prior conference where I made a

8     distinction between facts and communications.  First of all,

9     I'm flattered he thinks I'm so learned, but that's the United

10    States Supreme Court made that distinction.

11         However, what is ignored completely in our letter is

12    while, yes, attorney-client applies to communications and not

13    facts, that's law since Upjohn; but it's also in our letter it

14    has to be a confidential communication.

15         THE COURT:  I'm sorry, why are we pivoting to

16    privileged communications now when we were specifically -- I

17    do understand there was an assertion that these reports -- but

18    not on video.  I'm not hearing anything on the video.  The

19    video is done, over.

20         MR. BENSCHAR:  Your Honor, I'm not addressing the

21    video.

22         THE COURT:  Again, let me be clear this conference

23    started at 11 -- at 12, it is now almost 1:00 o'clock.  I'm

24    going to give you ten more minutes and be done.  So if you

25    have things that are really important for me to hear about,

PROCEEDINGS

1   now is the time, because I'm not going to let this go on all

2   afternoon.  I have other cases.

3           MR. BENSCHAR:  I appreciate that, your Honor.  There

4   are two things that we want.  We want the communications from

5   Abbott, whether it's counsel, investigators, whoever, sending

6   them to Ireland, the samples to Ireland.  And we want the

7   communications back saying these are authentic, just like we

8   got the reports saying these are counterfeit.  Those are the

9   two things we want.

10          There are communications, Abbott has said two

11  things, they are not relevant and they are privileged.

12          One, they are relevant because it shows, as I

13  discussed before, that's probative of when did Abbott know

14  that these were authentic.  Did they send it to Ireland --

15          THE COURT:  Mr. Benschar, I understand what you're

16  argument is.  Can I hear from Mr. Waters, please.

17          MR. WATERS:  Sure, your Honor.  Look, there weren't

18  a lot of counterfeits in there when we did the seizure,

19  everything had been sold.  The day before the seizure, H&H has

20  produced a document from H&H to Holland Trading saying, I

21  understand the latest 10,000 boxes got stopped at the border,

22  I'm going, let me see if I can get them in.

23          That's why the boxes weren't there because they had

24  been sold.  And then the latest shipment that they ordered got

25  stopped at border.

PROCEEDINGS

1           It doesn't matter.  They admitted everything they

2    bought and sold from Holland Trading is counterfeit.  There is

3    no dispute that outside from the handful of boxes, where we

4    issued a counterfeit report and spelled out why we thought

5    those handful of boxes were counterfeit, there is no dispute

6    that the rest weren't.

7           THE COURT:  Can I ask you, the communication sending

8    the samples to Ireland and any communication I understand may

9    have been work product or it may be communications between an

10   attorney and, I don't think it's the client, you're sending

11   them -- the Ireland facility is the Abbott client?

12          MR. WATERS:  Yes, it's and Abbott facility.

13          THE COURT:  But their point is, you've given them

14   those communications for what was counterfeit.  Why do you

15   have a problem in getting the communications regarding the

16   ones that were authentic?

17          I think their point is that you held on to the

18   authentic goods for a period of time and they are going to try

19   to make that into a centerpiece of your wrongdoing.

20          MR. WATERS:  I'm happy to talk about the centerpiece

21   of our wrongdoing element.  In terms of communication, we

22   didn't produce any attorney-client communications.  We

23   produced final reports, that's what we agreed to do.

24          THE COURT:  Do you have a report regarding the

25   authentic goods?

PROCEEDINGS

1          MR. WATERS:  No, because that was -- the vast

2     majority of them and the report would say the boxes look the

3     same.  No, there are no final reports or anything like that.

4          As far as I -- I haven't researched everyone's

5     e-mail at my firm, I think it was a phone call.  Whatever it

6     is, the communication between counsel and the client we have

7     never produced.  They are intended to keep confidential.  Yes,

8     we intended to report the fact that the tests were analyzed,

9     here are the ones we found counterfeit, here are the ones not.

10    We intended to produce a report that says these are the

11    counterfeits and that's why.

12         But the attorney-client communications, the work

13    product communications, concerning how that was done, those

14    are still work product and privilege.  Just like H&H

15    communications with its clients, to comply with discovery

16    orders.

17         THE COURT:  Can I ask, when was the report saying

18    that, the report that some were counterfeit, when was that

19    given to Abbott?  What is the date on that report?

20         MR. WATERS:  I don't have the date in front of me; I

21    think counsel for H&H might.

22         MR. BENSCHAR:  Your Honor, those reports are dated

23    sometime near the end of June 2017, so it's approximately a

24    month after the seizure.  Heres the thing, see this is a

25    perfect example.  Mr. Waters says there is no final report.

PROCEEDINGS

1   So what that means is, yes, there is no detailed report

2   analyzing okay we looked at this box and it's authentic.  It

3   doesn't mean there is not an e-mail or letter or something

4   saying, okay, we looked at them, all three are counterfeit,

5   we'll send you the report, everything else is authentic, thank

6   you counsel.

7          THE COURT:  And why would that not be privileged?

8          MR. BENSCHAR:  Because that's nothing confidential

9   because they were -- the client authorized that to be then

10  conveyed to us, to H&H, to the Court.  And Mr. Potter got up

11  in open court, it's on the record, we submitted that.  It's

12  well established law if a client says something to his

13  attorney with the intention -- we said it in our brief -- with

14  the intention to be conveyed to a third-party or with

15  permission to be conveyed, that is not confidential, it's not

16  privileged.

17         THE COURT:  But that's different than saying if they

18  are e-mails between them that all the e-mails have to be

19  turned over.  I don't think anybody is disputing that the vast

20  majority of what they seized from H&H turned out to be

21  authentic.  That's the fact, that's not privileged.  Again,

22  we're dancing on the head of a pin here.

23         But the real issue here is, Mr. Benschar, you want

24  the actual e-mail or back and forth between the lawyers and

25  the people in Ireland, and that's what they are saying they

PROCEEDINGS

1  won't turnover to you.

2          MR. SPRINGUT:  You know what, I don't see that

3  anywhere on their privilege log, which is very interesting.

4          MR. WATERS:  After the inception of this litigation,

5  neither party listed things on the privilege log after the

6  interception of this litigation.

7          THE COURT:  Wait, wait, wait.  I'm looking at the

8  seizure order and unless I'm mistaken, I don't see where Judge

9  Amon ordered there be a report turned over.  I see that there

10  was supposed to be two boxes of each lot number sent to the

11  Abbott's Lab and factory in Ireland to be inspected.  But I

12  don't really want to go off too much further on this because

13  again, if there is communications between the Patterson

14  Belknap attorneys and their e-mail communications with anybody

15  at the Abbott Lab regarding when are we getting the boxes or

16  did you look at the boxes or any of that, I don't think that

17  they have the duty to produce those to you.  And they did give

18  you --

19          MR. BENSCHAR:  That's not exactly what we're looking

20  for.  We're looking for an e-mail or a letter reporting these

21  are authentic.

22          THE COURT:  But again, you asked me, you said you

23  want the communications to Ireland, the communications sending

24  the samples to the Ireland and the communication getting the

25  samples back from Ireland, that's what you told me you wanted.

PROCEEDINGS

1          MR. BENSCHAR:  What I said I wanted -- the first

2    half is correct, what I want is the report.  The samples were

3    never sent back.  I think they destroyed them.  A report

4    saying all that the other three that we gave you, the detailed

5    report on everything else, is authentic.

6          THE COURT:  They say there is no report.  So that's

7    the end of that.

8          MR. SPRINGUT:  Your Honor, no, excuse me, no.

9    Mr. Waters did not say that.  He said there is no final

10   report, which means there is no detailed analysis, but he did

11   say there may be e-mails.

12         THE COURT:  He said it might have been a phone call.

13   Again, what is it that you're asking for?  You said you want

14   the communications, sending the samples to Ireland and the

15   communications getting them back.  And they may have not have

16   been sent back, that's what everybody seems to be in agreement

17   about.

18         MR. BENSCHAR:  We didn't agree.  Mr. Waters didn't

19   even represent.  He said it may be e-mails or a phone call.

20   If there is no e-mails, there is nothing to produce.  But they

21   haven't said that.  They said we refuse to produce it because

22   it's irrelevant or privilege.  It is relevant and not

23   privileged.

24         THE COURT:  Tell me why is it relevant.  If they've

25   already put on the record that the most of the goods that were

PROCEEDINGS

1    seized were authentic, why is it relevant that they have

2    communications between the lawyer and the lab, which is the

3    client, turned over to you?

4             MR. BENSCHAR:  Because --

5             THE COURT:  If they are not disputing that they were

6    authentic, why is that communication relevant?

7             MR. BENSCHAR:  It's relevant because it shows when

8    Abbott and its counsel knew these items were authentic

9    relative to when they returned them.  If, for example, as I

10   surmise, they knew let's say within a month because we know a

11   month later they were told the other ones were counterfeit

12   because that's when they were dated.  So they knew a month

13   later they seized 5,000 authentic items, they didn't return

14   them until four-and-a-half later.  Meanwhile, you have an

15   order from Judge Amon saying they ought to be returned, shall

16   be returned to H&H.

17            THE COURT:  There is no time.

18            MR. BENSCHAR:  Are you seriously saying therefore

19   they can hold it forever?  That's absurd.

20            THE COURT:  Again, calm down, Mr. Benschar.

21            Mr. Waters, would you like to respond?

22            MR. WATERS:  I've said it all in the brief, your

23   Honor.  I think your Honor is agreeing with me, the

24   communications with us are privileged.  There is no fact

25   dispute here.  They can argue they know when we returned the

PROCEEDINGS

1   product.  They can argue until they are blue in the face, even

2   though there is no date to return.  Even though they couldn't

3   sell the product.  Even though we were actively negotiating to

4   try to resolve the fact that they couldn't sell the products

5   so that they could.  And the fact that they actually did sell

6   the product.

7           And they still want to say that's their defense to

8   our crime Court motion, they have everything they need to do

9   so.

10          I just can't believe we're spending so much time

11  talking about discovery about the seizure, after they resolved

12  this, and they stipulated everything they bought and sold from

13  Holland Trading was counterfeit.

14          MR. SPRINGUT:  What I think needs to be done is they

15  need to be ordered to produce these communications.  Abbott

16  takes the position that they are privileged; put it on a log,

17  and we'll deal with it there.

18          THE COURT:  Sorry, Mr. Springut, I do not agree with

19  you.  I have to say that, again, if your argument is that they

20  knew in June of 2017 that there was authentic product that had

21  been seized, take it from there.  Ask them to admit it.  Ask

22  them during a deposition.  When did they get verification that

23  the majority of what was seized was authentic.  There are

24  other ways that you'll be able to get at this information.  I

25  don't agree that you are entitled to the communications

PROCEEDINGS

1   between counsel.  And whoever it was in Ireland regarding

2   whatever was sent over and whatever came back.  And why wasn't

3   this addressed in this the November stip regarding the

4   preliminary injunction?

5          MR. SPRINGUT:  I don't know the answer to that.  But

6   it's being addressed now, Judge.

7          THE COURT:  No, no, no, no.  Again, I ask you a

8   question and you say you don't know why.

9          MR. SPRINGUT:  Because they were fighting for it and

10  Abbott wouldn't give it back to them.  Okay.

11         THE COURT:  But that's what you were --

12         MR. BENSCHAR:  Abbott has since alerted us and said

13  they are going to file a sanctions motion.  They didn't say

14  that in November.

15         THE COURT:  That's not what I'm talking about,

16  Mr. Benschar.

17         At the time that you were asking the Court to make

18  Abbott return the authentic boxes, you were before Judge Amon

19  and you clearly could have asked all sorts of things about

20  what date were their communications establishing, let's assume

21  your date is correct, that when they knew that there was a

22  small amount of counterfeit in June of 2017, they knew at that

23  same time.  And I understand that was a different attorney,

24  but that doesn't mean that you now get to start bringing up a

25  privilege log for communications.  Judge Amon was clear that

PROCEEDINGS

1  there was to be a return of the authentic goods, but it did

2  not say a date.

3        I understand that you're now fighting before Judge

4  Amon saying that this was improperly withheld from your

5  client.  But I agree that Mr. Waters has the better argument

6  here, which is that there was a TRO in place, you weren't

7  going to be selling these goods, that's now been made

8  permanent, I have nothing else to give you on this.

9        So I have directed that you can have your

10 deposition.  You could ask them about any hidden payments that

11 you are entitled to know.  What the inventory management fee

12 range is.  And they should give you a sworn statement as to

13 what that range is.  And I'm not going item by item through

14 the privilege log with you.

15       I'm going to give you several weeks to come to some

16 agreement about that or you could ask me to put this on for

17 another conference.  And I'd appreciate if you're going to do

18 that, to try to figure out a date that works for both of you

19 and then contact my chambers and we'll try to accommodate you.

20       So your motions have been granted in small part and

21 denied in large part.  I have said that you can workout the

22 inventory management fee range.  I've said that the PBM

23 contracts for the 2016 and 2017 up until the point of the cut

24 off, which I believe was two days after the action was filed.

25 And that you'll go back to the drawing board about the

PROCEEDINGS

1  privilege log.

2         Is there anything else that needs to be addressed on

3  behalf of Abbott Labs today?

4         MR. WATERS:  No, your Honor.  One thing I want to

5  add, Mr. Potter apologizes for not joining.  He's at a

6  deposition.  He wanted to call in during a break, but he

7  couldn't.  I appreciate your time.

8         THE COURT:  I'm glad he does some work on his own

9  without you, Mr. Waters.

10        Anything else on behalf of the H&H Wholesale

11 Services, defendants?

12        MR. BENSCHAR:  On the last time we were discussing,

13 I understand your Honor's ruling, we're not precluded from

14 interrogatory or deposition that will pin Abbott down when it

15 sent the items to Ireland and when the report came back that

16 the items were authentic.

17        THE COURT:  I had said perhaps a deposition would be

18 the best way; but if not, I'm not precluding you from making

19 any request.  I just don't want you to ask for the documents.

20        One second -- my astute law clerk is pointing out

21 you're mixing up two things.

22        I thought the deposition would get at your point

23 about whether there were any other hidden payments and that I

24 was not allowing you to get the distribution agreements, and I

25 thought that a deposition was the best way to get at that.  I

PROCEEDINGS

1  don't know the deposition is the best way to get an answer on

2  the question on what date did they hear back from Ireland that

3  the bulk of the samples were authentic and not counterfeit.

4  So again, I don't think I said that the best way to do that

5  would be by deposition, but I'll leave that to you and

6  Mr. Waters to try to ascertain.  I don't think you're entitled

7  to get the communication sending the samples to Ireland or the

8  communications between counsel and the client getting them

9  back.

10          MR. SPRINGUT:  Your Honor, with regard to that, I

11  would ask that, have it be ordered to put those communications

12  in a privilege log.

13          THE COURT:  I'm not ordering them to do that.

14          Anything else before we adjourn?

15          MR. SPRINGUT:  Nothing else, your Honor.

16          MR. BENSCHAR:  Nothing else.

17          THE COURT:  And we'll put the reporter's name into

18  our minute order so that you have that.  You can order the

19  transcript from Ms. Teich.

20                    *    *    *    *    *

21  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

22

23  Rivka Teich, CSR RPR RMR FCRR
    Official Court Reporter
24  Eastern District of New York

25