1

```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

     - - - - - - - - - - - - - - - - -X

     ABBOTT LABORATORIES, at al.,      :
                                                17-CV-3095(CBA)
                    Plaintiff,         :

          -against-                    :    United States Courthouse
                                            Brooklyn, New York
     H&H WHOLESALE SERVICES, INC.,     :
     et al.,
                                            April 17, 2018
                    Defendant.         :    4 o'clock p.m.

     - - - - - - - - - - - - - - - - -X

                 TRANSCRIPT OF PRE-MOTION CONFERENCE
               BEFORE THE HONORABLE CAROL BAGLEY AMON
                     UNITED STATES DISTRICT JUDGE.


     APPEARANCES:

     For the Plaintiffs:       PATTERSON BELKNAP WEBB & TYLER LLP
                               1133 Ave of the Americas
                               New York, NY 10036

                               BY:  GEOFFREY POTTER, ESQ.
                                    TIMOTHY A. WATERS, ESQ.
                                    JONATHAN YONI SCHENKER, ESQ.


     For the H&H Defendants:   SPRINGUT LAW PC
                               45 Rockefeller Center, 20th Floor
                               New York, NY 10111

                               BY:  MILTON SPRINGUT, ESQ.
                                    TAL S. BENSCHAR, ESQ.


     Court Reporter:           Charleane M. Heading
                               225 Cadman Plaza East
                               Brooklyn, New York
                               (718) 613-2643

     Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
```

CMH    OCR    RMR    CRR    FCRR

2

1   THE CLERK:  Abbott Labs against H&H Wholesale
2  Services, 17-CR-3095, on for a pre-motion conference.
3   THE COURT:  Will the parties be seated.
4   For plaintiffs?
5   MR. POTTER:  Good afternoon, Your Honor.  My name is
6  Jeffrey Potter.  I'm with Patterson Belknap Webb & Tyler.  We
7  are counsel for the plaintiffs.  With me are my colleagues Tim
8  Waters who will be taking the lead in the argument today and
9  an associate who just joined us, Yoni Schenker who's here to
10 watch.
11  THE COURT:  Okay.  And for defendants?
12  MR. SPRINGUT:  Good afternoon, Your Honor.  Milton
13 Springut and Tal Benschar of Springut Law for the H&H
14 defendants.
15  THE COURT:  All right.  Mr. Springut, you want to
16 bring this motion.  Tell me how you think this would be
17 remotely successful.
18  MR. BENSCHAR:  Your Honor, the Second Circuit has
19 said you can be relieved of a stipulation for good cause.
20  THE COURT:  Well, this is more than a -- well, all
21 right.  This was a stipulation that was entered into which had
22 injunctive relief, correct?
23  MR. BENSCHAR:  Yes.  We're not moving to modify the
24 vast majority --
25  THE COURT:  Well, you're not moving to modify the

1   part that's beneficial to you that you reached an agreement
2   for, correct?
3              MR. BENSCHAR:  Well, actually, most of it is not
4   beneficial for us, for example, a preliminary injunction
5   enjoining us from dealing with any Abbott products, the
6   confirmation of a seizure.  The specific part that it relates
7   to is the admission that 23, it's almost 24,000 -- 23,931, I
8   believe, is the number -- that was purchased from one
9   supplier, Holland Trading, all of that was counterfeit.
10             THE COURT:  Who purchased it from Holland Trading?
11             MR. BENSCHAR:  My client, H&H.
12             THE COURT:  So your client at the time you signed
13  that stipulation would know what he purchased?
14             MR. BENSCHAR:  Well, they knew what they purchased
15  were genuine FreeStyle product.  The plaintiff brought the
16  action, said it's counterfeit.  Then the seizure and shortly
17  after the seizure, said there were multiple suppliers and they
18  said the one that's the counterfeiter is Holland Trading.
19  Then they brought on action in the Netherlands two months
20  later and obtained a seizure of documents there and had
21  thousands of documents of information and when they negotiated
22  the stipulation, they made representations about what they had
23  obtained that are not consistent with that documentation.
24             We only got that documentation two months later in
25  January and they made representations, we had the seizure and

1   the seizure paper show such and such, and that there's an
2   inconsistent --
3          THE COURT:  Are you saying you were deceived into
4   entering into the stipulation?
5          MR. BENSCHAR:  I'm saying that the representations
6   made that go about what the information from that company was
7   obtained that undermines the basis of the stipulation.  The
8   stipulation assumes that every single --
9          THE COURT:  Well, you could have asked to have seen
10  those documents at that time before you signed the
11  stipulation, correct?
12         MR. BENSCHAR:  They refused to do that because they
13  said they weren't --
14         THE COURT:  So you could have refused to sign the
15  stipulation?
16         MR. BENSCHAR:  We could have, but that doesn't give
17  them license to make affirmative representations.
18         THE COURT:  Are you saying they made affirmative
19  misrepresentations to you and you are going to prove that you
20  signed a stipulation based on affirmative misrepresentations
21  to you made by the plaintiffs?
22         MR. BENSCHAR:  Yes.  I'm going to show there's an
23  e-mail where they say, We've got the documents and they show a
24  limited number of lot numbers.  As you know, the FreeStyle
25  product has lot numbers that they use and that's been used

1  throughout the case, including by the plaintiff and including
2  by others, to say, okay, this is how we know this is
3  counterfeit.
4         You'll recall, Your Honor, that there were 4,800
5  items seized and then returned and admitted to be authentic
6  and they knew that based on these lot numbers and they said,
7  well, that doesn't come from Holland Trading, it must have
8  come from some other sources.
9         Now, what I'm saying is the representations made
10 about what the documents that they had obtained from the
11 seizure in the Netherlands is not consistent with what later
12 was produced to us two months later in January finally when
13 they were produced.  That's one problem.  The other problem is
14 in addition, those documentations also show Holland Trading,
15 well, this part we knew.  They purchased it from a company
16 called Pramie Medical and those, during the back and forth,
17 Pramie represented that they had six different sources for
18 the, for where this came from.
19        So what I'm saying is based on these
20 representations, they had all this information, they made
21 representations this is what the documents show, that there
22 was a back and forth about lot numbers and what's real and
23 what's fake, and it's not, what they said is not consistent
24 with --
25        THE COURT:  What did they say to you?  Did they say

1  that all lot numbers in this 23,000 were consistent with the
2  lot numbers of counterfeit boxes?  Did they say that?
3              MR. BENSCHAR:  No.  They said that the documents
4  obtained from Holland Trading show only one lot number and
5  they attached the document which had I think it was an invoice
6  and a shipping document that had, that happened to have one
7  lot number and that's true.  However, there's another document
8  that has a list of ten which Holland Trading sent the e-mail
9  to its supplier saying here are all the lot numbers you sold
10 us, tell us where these came from, which I think they never
11 actually did.
12             So, the point is they had in hand many more lot
13 numbers.  Not all of them can be confirmed as counterfeit.  So
14 what I'm saying is the fact --
15             THE COURT:  So, they misrepresented to you that they
16 had one lot number that they knew were counterfeited and that
17 all 23,931 were from this lot number, is that what they said
18 to you?
19             MR. BENSCHAR:  No.  No.  They said that we don't
20 know what all the lot numbers are that Holland Trading sold
21 but they said when we had the seizure from Holland Trading and
22 the documents, there is only one document that shows a single
23 lot number.  That's not true.  There was another document that
24 showed ten which they, Holland Trading had acquired from
25 Pramie Medical and then Holland Trading, to my understanding

1  everything was sold to H&H except for one return shipment.
2          THE COURT:  Well, what proof do you have now that
3  something sold from H&H through Holland Trading was not, in
4  fact, counterfeit?  What proof do you have of that?
5          MR. BENSCHAR:  Well, the answer to that is it's
6  their burden to show what was --
7          THE COURT:  Well, the answer is you agreed to it and
8  if you could show, there might be something to this if you
9  could show now, in fact, that the 239,931 boxes were not
10 counterfeit but you can't.  You're not even purporting to show
11 that right now, right?
12         MR. BENSCHAR:  Well, the problem with that is those
13 have all been sold so nobody knows what was sold, but we do
14 know there were other items seized that were genuine, were
15 admitted to be genuine, in fact, were returned.
16         THE COURT:  But not boxes that had come from Holland
17 Trading?
18         MR. BENSCHAR:  Well, we don't know where they came
19 from.  They say based on their analysis, those must have come
20 from somebody else.  So what I'm saying is it's their -- if
21 there wasn't a stipulation, it's their burden to show --
22         THE COURT:  What's their burden?  You signed a
23 stipulation.  It's their burden to show what?  You're the one
24 who has entered into a contract, your client did, agreed to
25 something and got some benefit from doing this, was allowed to

8

1  sell off, I guess, a lot of inventory that would have
2  otherwise, may have expired, so you did receive some benefit
3  from engaging in this so I don't know why you are talking
4  about their now having some burden.  What burden do they have?
5  You signed it.  There is a stipulation.  The Court ordered it.
6  So what burden do they have?
7            MR. BENSCHAR:  I'm saying before the stipulation,
8  one, they can come in and say we purchased some samples and
9  they are counterfeit.  That establishes liability.  But the
10 fact that you have a few samples that gets you liability, that
11 doesn't get you every single one from that supplier is
12 counterfeit.  You may ask the trier of fact to infer that
13 based on the totality but that's an inference.
14           THE COURT:  But you agreed to it.  You agreed that
15 everything that came from Holland, you were willing to say,
16 yes, that's counterfeit.
17           MR. BENSCHAR:  Right, we did agree to that.
18           THE COURT:  And you're the guys who bought the stuff
19 from Holland.  Presumably you knew what you would have gotten
20 from Holland.
21           MR. BENSCHAR:  Well --
22           THE COURT:  I mean, you're the one, it seems to me,
23 who is in possession of the most of the packs, right?
24           MR. BENSCHAR:  That's not true.  We purchased on
25 good faith belief these were genuine goods.  Now it turns out

1  that some of them are counterfeit.  They made these test
2  purchases to get the seizure and that's what happened.
3              THE COURT:  So you're saying we took your word for
4  it that everything from Holland was counterfeit, we took your
5  word for it, we didn't challenge you, boy, we should have done
6  that because now we think maybe something that came from
7  Holland was not counterfeit; is that your basis?
8              MR. BENSCHAR:  I'm saying more than that.  We took
9  your word for it that the documentation you got from a
10 supplier from an action in the Netherlands where the bailiff
11 went, just like we had in this case, a bailiff in the
12 Netherlands seized their server, their computers, and took a
13 bunch of information and gave it to the court's possession and
14 then a month later, the judge in Holland said give them all
15 the information.
16             We took -- they had that since September.  They
17 didn't give it to us.  They said this is what we see, there is
18 only one lot number.  That's not true.  Now we have the
19 documents, you know, months later.  It's not the case.
20             THE COURT:  But do you have any proof that any of
21 these other lot numbers that you now say you have were not
22 counterfeit?
23             MR. BENSCHAR:  Affirmative proof that they're not
24 counterfeit?  No.  We don't have, we can't trace --
25             THE COURT:  Because they complained that you didn't,

10

1  I haven't seen the full e-mail either, but they complained
2  that you only provided a snippet of an e-mail, that the rest
3  of the e-mail suggested that some of the stuff was
4  questionable, the e-mail that you rely on.
5           MR. BENSCHAR:  Well, Holland Trading was having a,
6  I'll character it as a dispute with its suppliers, no doubt
7  about it, but the question is when you put these things
8  together, we have a situation where the, you know, we were
9  relying on -- they brought the action in the Netherlands.
10          THE COURT:  How does this hurt you, that there were
11 23,000 boxes?
12          MR. BENSCHAR:  Because it goes to damages.  It goes
13 to the amount of damages.  They've told -- they haven't issued
14 it yet, but they told us they were going to do a report which
15 is similar in the prior case, the 2015 case that's pending,
16 that basically said every item is $50 in damages.  If you add
17 it up, that's a large amount of damages.  Putting aside
18 whatever problems their expert has, that's a separate issue,
19 they're going to say every single one is counterfeit and I
20 want to put them to the burden of proof.  At the end of day,
21 they may win that, they may convince the trier of fact.
22          THE COURT:  Why should they have to if you agreed to
23 it and signed a stipulation?
24          MR. BENSCHAR:  Because I believe it was done on a
25 false premise and information about -- if they haven't done

1 anything in the Netherlands at all, that would be one thing,
2 but they went to the Netherlands -- by the way, the
3 Netherlands does not allow document discovery on Hague
4 Convention, only depositions. In fact, it's not even clear
5 they even allow that. They we had no way of getting those
6 documents and they got it through a seizure and they made the
7 representation this is what the seizure documents showed.
8     THE COURT: But you could have asked to see the
9 documents before you agreed to the stipulation.
10     MR. BENSCHAR: Right, and they refused to do that
11 until later when we exchanged documents two months after the
12 fact.
13     THE COURT: Well, if they refused to do it, you
14 didn't have to sign the stipulation.
15     MR. BENSCHAR: Right.
16     THE COURT: You knew the documents existed. You
17 didn't ask to see them and you signed the stipulation.
18     MR. BENSCHAR: Right.
19     THE COURT: Correct?
20     MR. BENSCHAR: There's no reason to think that
21 they're going to misrepresent what the documents say. I don't
22 have to review every single document to rely on counsel saying
23 this is what it says.
24     THE COURT: Okay. Let me just hear briefly because
25 I have an event I have to attend.

12

1  MR. WATERS: Your Honor, I think this is ridiculous.
2  I don't even to respond on the merits. Our views are clear.
3  The only thing I would like Your Honor to address on
4  our end, we do intend to move for sanctions and we have the
5  Rule 11 21-day safe harbor. I ask Your Honor to find there is
6  no safe harbor given that they knew our position for a very
7  long time and we have until whatever deadline Your Honor sets
8  to decide whether to file this motion in light of comments
9  Your Honor has made at the pre-motion conference.
10  THE COURT: So you want to have your response to the
11  motion to include a --
12  MR. WATERS: Motion for sanctions.
13  MR. BENSCHAR: Your Honor, it's a little surprising.
14  Rule 11 is quite clear. You have to make a separate motion.
15  You have a 21-day safe harbor and the Second Circuit says
16  there's a strict requirement. There's no discretion to say --
17  THE COURT: Does that give you all those days to
18  withdraw the motion, you mean?
19  MR. BENSCHAR: They have to serve a motion. Even a
20  letter is not sufficient. That's what the rule says. The
21  Second Circuit has made that very clear.
22  MR. WATERS: Your Honor, Rule 11(c)(2) provides the
23  21 days of service, that's the safe harbor provision, or
24  within another time the Court sets. I'm asking you to set it
25  at zero given the proceedings we've had and given that there

13

1 can be no surprise because we've discussed it extensively and
2 they've had our letter since March 6th.
3    MR. BENSCHAR: It still requires a motion, a
4 separate motion. That's what the rule says. And, you know,
5 Your Honor will do -- well, that's our position.
6    THE COURT: You want to file it as a separate motion
7 the same day you file the reply?
8    MR. WATERS: Sure. That works for us, Your Honor.
9    THE COURT: Okay. So when can you file your motion?
10    MR. BENSCHAR: So my proposal, Your Honor, is to do
11 it as follows.
12    THE COURT: Is to what? I'm sorry. I didn't hear
13 you.
14    MR. BENSCHAR: I wrote out some dates.
15    THE COURT: Okay. Have you talked to counsel about
16 the dates?
17    MR. BENSCHAR: No, but here is the proposal. We
18 will file our motion in three weeks from today, that's
19 May 8th. They have three weeks and a day for opposition and
20 the reason I say "and a day" is because the --
21    THE COURT: What date is that?
22    MR. BENSCHAR: May 30th. The reason I give them an
23 extra day is it's a day after Memorial Day so I give them an
24 extra day.
25    THE COURT: What a prince.

1    MR. BENSCHAR: Well, I'm trying to be reasonable.
2 And then two weeks for reply, June 13th. So, to repeat,
3 May 8th.
4    THE COURT: Any objection to that schedule,
5 gentlemen?
6    MR. WATERS: If I can just confer for a second,
7 Your Honor.
8    THE COURT: Okay.
9    MR. WATERS: Your Honor, that's -- Your Honor, we
10 can deal with that if we can also tack on our motion for
11 simultaneous filing for sanctions with our opposition briefs.
12 So we would be filing that on May 30th. We would ask that
13 they reply two weeks later, their opposition two weeks later,
14 and another two weeks for us to reply.
15    THE COURT: What dates are those?
16    MR. WATERS: I apologize, Your Honor. I should have
17 looked that up.
18    So that would be -- Counsel, am I correct, you are
19 proposing June 13th for your reply brief on your motion?
20    MR. BENSCHAR: Right.
21    MR. WATERS: So I would propose June 13th for the
22 opposition to our sanctions motion and then two weeks later
23 which goes to June 27th for our reply in support of the
24 sanctions motion.
25    THE COURT: Okay. June 27th is the date you put

15

1  down, right?  So I'll put this down for July 10th at 2 o'clock
2  to hear argument and counsel will notify me if you decide not
3  to file the motion.
4           MR. BENSCHAR:  Certainly, Your Honor.  By letter?
5           THE COURT:  Yes, that's fine.  If you decide not to
6  file the motion, notify me of that before May 8th.
7           All right.  Thank you, gentlemen.
8           MR. WATERS:  Thank you, Your Honor.
9           MR. BENSCHAR:  Thank, Your Honor.
10          (Matter concluded.)
11
12
13                    *     *     *     *     *
14
15
16 I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
17
18     /s/ Charleane M. Heading              April 19, 2018
   _____       _____
19        CHARLEANE M. HEADING                    DATE
20
21
22
23
24
25